**Lansing, Michigan**

# Opinion

Chief Justice:            Justices:

Robert P. Young, Jr.   Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 31, 2012

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                           No.  141154

SELESA ARROSIEUR LIKINE,

        Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                           No.  141181

MICHAEL JOSEPH PARKS,

        Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                           No.  141513

SCOTT BENNETT HARRIS,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARY BETH KELLY, J.

These three cases involve the felony of failure to pay court-ordered child support (felony nonsupport) under MCL 750.165 and the rule of *People v Adams*,[1] which held that inability to pay is not a defense to this crime. We granted leave to consider the constitutionality of the Court of Appeals' ruling in *Adams* and now clarify that, while inability to pay is not a defense to felony nonsupport pursuant to MCL 750.165, *Adams* does not preclude criminal defendants from proffering the common-law defense of impossibility.

These cases require us to consider, for the first time, the nature of Michigan's felony-nonsupport statute and the proper defense to a nonsupport charge. We endorse the well-established common-law defense of impossibility as the proper defense to felony nonsupport. In doing so, we differ from the dissent both in terms of our temporal view and our sense of parents' financial priorities. Consistently with the Legislature's expressed intent in the child support statutes, we believe that to avoid conviction for felony nonsupport, parents should be required to have done everything possible to provide for their child and to have arranged their finances in a way that prioritized their parental responsibility so that the child does not become a public charge. Unlike the dissent, which would undermine the legislative choices that are reflected in the statutory

---

[1] *People v Adams*, 262 Mich App 89; 683 NW2d 729 (2004).

2

child support framework, our view of parental responsibility and obligation leads us to recognize the impossibility defense. This defense differs from that advanced by the dissent because we provide guidance to the circuit courts regarding how the defense is to be adjudicated, and although a parent's ability to pay is one factor we consider, we also take other factors into account. Allowing a mere inability-to-pay defense as the dissent suggests would undermine Michigan's legislative system, which requires ability to pay to be considered in establishing the support order in the first instance, explicitly prohibits the retroactive modification of child support orders, and makes nonsupport a strict-liability criminal offense. Our view is consistent with the plain language of Michigan's nonsupport statute and gives as much meaning as possible to the Legislature's expressed intentions, as we are required to do by our Constitution. If Michigan has placed greater priority than other states on the issue of child support as reflected in its child support laws, we are, in recognizing this defense, simply permitting the Legislature to legislate as it sees fit, in accordance with its legislative directive and in accordance with our judicial role.

## I. FACTS AND PROCEDURAL HISTORY

### A. *PEOPLE v LIKINE*, DOCKET NO. 141154

Defendant Selesa Arrosieur Likine (Likine) and Elive Likine (Elive) divorced in June 2003. The Family Division of the Oakland County Circuit Court (the family court) gave Elive physical custody of the parties' three children and ordered Likine to pay child support. The family court recognized Likine's "history of fairly serious mental health conditions" and her diagnosis of depressive-type schizoaffective disorder. The family

3

court initially ordered $54 a month in child support and then raised it to $181 a month in August 2004.

Beginning in 2005, Likine failed to comply with the order requiring her to pay child support.[2] Elive sought an increase in child support payments that same year. The Friend of the Court (FOC) referee recommended that Likine's child support obligation be increased to $1,131 a month on the basis of the parties' testimony and evidence that she had secured two mortgages, listing income as $15,000 a month on the applications, to purchase a home worth $409,000.[3] The referee imputed income of $5,000 a month to Likine,[4] reasoning that this was the minimum income required to meet the "bare bones

---

[2] Testimony at trial would later reveal that during the period when Likine's child support obligation was $181 a month, "[t]here was only one month in which the current support plus a little bit of arrears was paid." Likine paid no child support in 2006, and paid $488.85 in 2007. From January through March 2008, she paid a total of $100. According to Likine, she had been unemployed since September 2005, after being hospitalized; she had earned, at most, $19,000 a year; after January 2006, she subsisted on social security disability payments of about $600 a month.

[3] The referee noted that Likine was "very evasive[,] as she [had] been in past hearings, about the nature and source of her income." Likine also indicated that she had financed her lifestyle using credit cards and did not believe that her child support should be increased "for her poor financial decisions."

[4] MCL 552.519 establishes the state Friend of the Court Bureau and charges it with developing and providing "[g]uidelines for imputing income for the calculation of child support" by the Office of the Friend of the Court. MCL 552.519(3)(k)(*iii*). MCL 552.517b, which pertains to review of child support orders, specifies that "[t]he friend of the court office may impute income to a party who fails or refuses to provide information" to the FOC, MCL 552.17b(6)(b), and provides that "[i]f income is imputed, the recommendation shall recite all factual assumptions upon which the imputed income is based," MCL 552.517b(6)(a).

4

monthly expenses" Likine had reported.[5]  After a two day hearing de novo, the family court adopted the FOC referee's recommendation in an order dated August 30, 2006.

On September 28, 2006, the family court denied Likine's motion for reconsideration in a five-page written opinion, concluding that Likine's testimony was not truthful, that her tax returns did not accurately reflect her income, and that Likine had "misrepresented her income so many times that there is no way to adequately determine her income."  The family court recognized that Likine "does suffer from some form of mental illness," but the evidence presented led the court to conclude that she was "working and earning an income" because she was "maintaining herself, including the payment of a substantial mortgage."  Although Likine's "actual income could not be determined due to her evasive testimony and numerous misrepresentations," the family court found that the amount of income imputed was appropriate.[6]

On March 20, 2008, the Department of Attorney General, Child Support Division, charged Likine criminally with felony nonsupport between February 1, 2005, and March 11, 2008, in violation of MCL 750.165.  On September 29, 2008, the prosecutor

---

[5] The referee concluded that Likine

> either has far more income than she is trying to convince the Court she has, or, she has other sources with which to pay her living expenses.  Either way, it would be patently unfair not to base child support on the income [Likine] sees fit to believe she is entitled to live on.

[6] Likine applied for leave to appeal that ruling, but the Court of Appeals denied leave "for failure to persuade the Court of the need for immediate appellate review." *Likine v Likine*, unpublished order of the Court of Appeals, entered March 14, 2008 (Docket No. 280148).

filed a motion in limine to bar Likine from offering or referring, directly or indirectly, to her ability or inability to pay court-ordered child support, including her employment status and claims that her actual income was less than the amounts used to calculate her support obligation. Citing *Adams*,[7] the prosecutor argued that evidence of inability to pay is not a valid defense to the crime of felony nonsupport, a strict-liability crime.

At the motion hearing on October 8, 2008, Likine argued that the prosecutor was seeking to deprive her of any defense to the charge against her and that this violated her constitutional right to due process. She claimed that she had no source of income or assets from which to pay the court-ordered child support. Likine further testified that she had been unemployed since September 2005, when she was released from a month-long hospitalization; that she was disabled with schizoaffective disorder, for which she had received periodic treatment, including medication; that her sole source of income was supplemental security income (SSI) amounting to $637 a month; that she had tried to hold a part-time temporary job but was physically and mentally unable to do so; that the bank foreclosed on and "short sold" her Rochester Hills home in June 2007; and that although she had held two professional licenses, they were inactive or had lapsed and she was unable to use them because of her credit rating and her disability. According to Likine, she had been able to pay $181 a month in child support in 2004 because that amount was based on her actual income. Likine provided the circuit court with a copy of her social security earnings record covering 1985 through 2003, which showed no

---

[7] *Adams*, 262 Mich App at 89.

6

income from 1994 through 2002.[8]  On October 21, 2008, the circuit court issued a written order granting the prosecutor's motion in limine.

At the jury trial in November 2008, the prosecutor presented the testimony of Elive and an FOC child-support-account specialist.  The specialist testified that the child support order entered when Likine and Elive divorced required Likine to pay $35 a month for one child and $48 a month for two.  The amount was subsequently increased, in August 2004, to $181 a month.  For the period subject to the felony-nonsupport charge, February 2005 through March 2008, the amount of support ordered was initially $181 a month, but in June 2005 it was raised to $1,131 a month.  The specialist testified that Likine had made very sporadic payments, including payments in only 12 of the 37 months charged, in amounts ranging from $100 to $281.

Elive also testified that Likine's child support payments were "very sporadic," stating that she only paid child support "when the Friend of the Court threatened her or they sent her a note."  Elive testified that Likine had told him that he "would suffer with those kids" by himself and that Likine had said she would "not [pay] any child support" because "women don't pay child support."  He stated that he sought an increase in the child support amount in June 2005 after Likine purchased a half-million-dollar home in Rochester Hills.[9]

---

[8] Likine also informed the court that another motion to modify was pending before the FOC referee who had issued the April 2006 report.

[9] Elive also testified that Likine had purchased a new vehicle around the time that she bought the house.  Likine testified that she had turned in a leased vehicle and acquired another leased vehicle.

Likine testified on her own behalf. She stated that she was able to pay both the $54 a month that was initially ordered and the $181 monthly amount, but when the support amount was increased to $1,131, she was unable to make the payment. She acknowledged that she had purchased the home in Rochester Hills, but stated that the house "was put in [her] name" and that her boyfriend had paid for it. In closing, defense counsel argued that the amount of Likine's child support had effectively been "made up" by using imputed income as the basis for calculation and that "the child support should not have been in the amount of $1,131." Counsel further argued that Likine was "being torn apart by factors she [had] no control over."

The jury found Likine guilty as charged. Likine moved for relief from the judgment or for reconsideration, arguing that MCL 750.165 should be declared unconstitutional or, alternatively, that the order granting the prosecutor's motion in limine should be reconsidered and vacated so that Likine could offer a defense to the charge. The circuit court denied the motion "for the reasons first stated upon the record October 8, 2008 and that this matter is a strict liability offense." Subsequently, the circuit court sentenced Likine to probation for one year with 48 days' credit and stated that the family court would determine the amount of restitution.

In February 2009, Likine filed a claim of appeal, and in March 2009, through appellate counsel, she also moved for a new trial in the circuit court. Likine argued that her rights under the Michigan Constitution's Due Process Clause were violated when she was not allowed to present evidence of her inability to pay as a defense to the criminal

8

charge of felony nonsupport.[10] The circuit court denied the motion on the record, citing *Adams*[11] for the rule that inability to pay is not a defense to this strict-liability offense.

The Court of Appeals affirmed, holding, in part, that Likine's "argument is actually an impermissible collateral attack on the underlying support order."[12] The Court of Appeals concluded that defendant's right to due process had not been violated because felony nonsupport is a strict-liability offense, so evidence of her inability to pay was not relevant.

We granted leave, with *People v Parks* and *People v Harris*, to consider whether the rule of *Adams*, which held that inability to pay is not a defense to the charge of felony nonsupport under MCL 750.165, is constitutional.[13]

### A. *PEOPLE v PARKS*, DOCKET NO. 141181

Defendant Michael Joseph Parks (Parks) and his wife Diane Parks (Diane) divorced in September 2000. Defendant, an orthopedic surgeon, was a rural physician with a solo practice who sometimes worked as a contract physician. The Ingham family court initially ordered defendant to pay $230 a week in child support for the parties' three children. On August 19, 2003, the family court modified Parks's support obligation to

---

[10] Likine's motion for a new trial characterized her argument as pertaining to an "ability to pay" defense. However, the motion itself, and her brief in support of the motion, cite this Court's ruling in *Port Huron v Jenkinson*, 77 Mich 414; 43 NW 923 (1889), and assert that it was "impossible" for her to fulfill her support obligation.

[11] *Adams*, 262 Mich App at 99-100.

[12] *People v Likine*, 288 Mich App 648, 654; 794 NW2d 85 (2010).

[13] *People v Likine*, 488 Mich 955; 790 NW2d 689 (2010).

9

$761 a week. That obligation was in effect throughout the criminal proceeding in this case.

Parks was charged criminally with violating MCL 750.165 for failing to pay child support from October 1, 2006, through July 15, 2008. At a bench trial in January 2009, Diane testified that Parks had made no support payments during the period charged. She testified that during that time, Parks had made several requests for a reevaluation of his child support obligation and that there had been a hearing before the family court at which Parks was represented by counsel. After this hearing, the family court denied Parks's request because he had failed to provide any documentation to substantiate his claim that he could not meet his child support obligation.

An Ingham County FOC officer testified at the trial. The officer testified that Parks had made no child support payments from October 2006 to July 2008 and that the FOC had tried to enforce Parks's child support obligation by initiating show-cause hearings and obtaining income-withholding orders and bench warrants for Parks's arrest. As of the date of the trial, none of these attempts had been successful. Parks's child support arrearage amounted to more than $262,000.

Parks testified that the FOC improperly imputed to him the income of an urban physician in a group practice, whereas his income as a rural sole practitioner was "considerably lower."[14] Also, Parks testified that probation conditions imposed by a

_____

[14] While the prosecutor argued that inability to pay was not a defense pursuant to *Adams*, the trial court did not curtail Parks's testimony, indicating that because it was a bench trial and the judge understood the law, Parks's testimony regarding his improperly imputed income made no difference.

federal court hampered his ability to practice medicine[15] and thereby impaired his ability to pay child support. Parks further testified that he was currently disabled,[16] was receiving disability benefits from the federal government, and had declared bankruptcy in 2005. Parks testified that he "believe[d]" that he had made child support payments between October 2006 and July 2008. When asked to provide documentation, Parks produced a report from the child support enforcement system that he evidently thought would reflect that he had made payments, but the court examined the report and noted that it showed "all zeroes," indicating that he had paid no child support in or after October 2006.

At the close of trial, the prosecutor argued that each of the three elements necessary to convict Parks of violating MCL 750.165 had been established: that Parks was ordered to pay child support, that he was either personally served or appeared in the underlying matter, and that he had failed to pay the ordered amount. Defense counsel argued that Parks "did all that he could to comply" with his child support obligation and was "doing what he could to reestablish his practice." Defense counsel urged that Parks's

---

[15] Defense counsel admitted into evidence a March 2005 order of the United States District Court for the Western District of Michigan amending Parks's 2003 judgment in a criminal case. The amended judgment sentenced Parks to 90 days' imprisonment for violating the terms of his federal probation that required him to "pay child support in accordance with his court-ordered schedule of payments" and to "support his dependents and meet other family responsibilities." In addition to serving 90 days' imprisonment, Parks was required to pay restitution in the amount of $28,623.34 to the Ingham County Friend of the Court within six months after the date of the amended judgment.

[16] According to a motion Parks filed in the Court of Appeals, he suffers from carpal tunnel syndrome in both hands.

11

child support payments be "adjusted."  The circuit judge explained that he did not adjust child support obligations because, as a circuit judge presiding over criminal matters, he was not authorized to adjust support orders, which are subject to the authority of the family court.  The circuit judge found defendant guilty as charged, stating that it was "obvious" that considering "the number of times Mr. Parks has refused to pay over the years, including the period of time in question here, . . . Mr. Parks has no real desire to comply with what the law says he is supposed to do" and that "Mr. Parks simply does not want to pay."

At sentencing, Diane stated that it was "very difficult to raise three kids without support," that all three children "have been working since the age of 16 to help support the house and themselves," and that she was taking only half of her multiple sclerosis medicine "to cut back in whatever ways" she could.  Alexis Parks, defendant's daughter, also made a statement, asking that Parks be incarcerated because "the only way he's ever paid is when he was in jail."  Parks was ordered to pay restitution in the amount of $234,444.83 and sentenced to 5 years' probation and one year in jail with credit for 205 days served, which would be suspended if he paid a portion of the restitution.

Parks appealed by right, and on April 20, 2010, the Court of Appeals affirmed in an unpublished opinion per curiam.[17]  The Court of Appeals noted that Parks had not raised the defense of inability to pay in circuit court and so reviewed the claim as an unpreserved constitutional issue.  The Court of Appeals relied on *Adams* to conclude that

[17] *People v Parks*, unpublished opinion per curiam of the Court of Appeals, issued April 20, 2010 (Docket No. 291011).

12

Parks could be found guilty of violating MCL 750.165 with no finding of intent or knowledge because the statute imposes strict liability and inability to pay is not a defense to a charge of felony nonsupport.

We granted leave, with *Likine* and *Harris*, again to consider whether the rule of *Adams* is constitutional.[18]

### C. *PEOPLE v HARRIS*, DOCKET NO. 141513

Defendant Scott Bennett Harris (Harris) and Lavonne Harris (Lavonne), divorced in November 2003. The Muskegon family court initially ordered Harris to pay $139 a month for his two children, and the amount was subsequently increased to $612 a month in 2006. Harris, who was living in Key West, Florida, was charged with felony nonsupport as a fourth-offense habitual offender for failing to pay his court-ordered child support between April 4, 2003, and May 7, 2008. Harris's child support arrearage amounted to nearly $13,000.

On September 25, 2008, Harris pleaded guilty as charged in exchange for a fairly complex sentencing agreement pursuant to *People v Cobbs*.[19] The Muskegon Circuit Court agreed that sentencing would be delayed by two months (until December 8, 2008) and that if Harris paid $3,000 of the child support arrearage, sentencing would be delayed until May 2009. If Harris paid another $5,000 on the arrearage by May 2009, the circuit court agreed that it would not sentence him to any type of incarceration, although he would still be subject to the imposition of probation, fines, costs, and tethering. The

---

[18] *People v Parks*, 488 Mich 955 (2010).

[19] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

13

circuit court stressed, however, that Harris would "need to stay current" in his support obligations in addition to paying the arrearage. After Harris agreed to the conditions, the circuit court accepted his guilty plea and permitted Harris to return to his home in Florida.

On December 8, 2008, Harris appeared before the circuit court for sentencing. At that time Harris had paid $1,500, roughly the amount of his ongoing child support payments, but he acknowledged that he had not paid any amount of the arrearage. His counsel argued that if Harris were permitted to remain free, Harris "would be able to raise a substantial sum." Defense counsel stated that defendant "want[ed] to try to comply," but that he was indigent, as evidenced by the court's having appointed counsel for him in the criminal proceeding. On allocution, defendant stated only that he had a back problem of 10 years' duration, and his lawyer added that Harris had "heart problems."

Lavonne asserted in her victim impact statement that Harris had told her on several occasions that she would "never see another dime from him regarding [the] two children." She recalled that defendant refused to provide any assistance with uncovered medical expenses when their son broke his hand and indicated that she could not afford to buy their son winter clothes because she could not "get any help from their father." She acknowledged that Harris had a back problem but was unaware that he had any heart problem. She stated: "He has an addiction problem to alcohol and drugs, is what he has. He has a problem with working." Harris was sentenced as a fourth-offense habitual offender to a prison term of 15 months to 15 years. The circuit court ordered costs and restitution of $12,781.39, the amount of the child support arrearage.

14

Through appointed counsel from the State Appellate Defender Office (SADO), Harris moved to withdraw his plea or for resentencing. At the hearing on August 10, 2009, the circuit court heard extensive argument, including Harris's claim that had he been permitted to do so, he would have testified that he had tried to generate income but could not because of his health conditions. The circuit court denied the motion in an opinion and order dated August 21, 2009. The circuit court stated that it was bound by *Adams* to apply MCL 750.165 as a strict-liability statute and that Harris also could not claim error based on the court's failure to consider his alleged indigency because Harris had agreed to the sentence agreement.[20]

On June 4, 2010, the Court of Appeals denied Harris's delayed application for leave to appeal for lack of merit.[21] Harris, still represented by SADO, sought leave to appeal in this Court, challenging the constitutionality of MCL 750.165.

We granted leave in this case, with *Likine* and *Parks*, to consider whether the rule of *Adams* is constitutional.[22] In addition, we granted leave in this case to consider whether the circuit court abused its discretion when it denied Harris's postsentencing motion to withdraw his plea and whether the circuit court erred when it adopted the

---

[20] In addition, the circuit court concluded that it was not improper for that court to adopt the arrearage as the restitution amount and requested supplemental briefing on Harris's challenge to the scoring of offense variable 9 (number of victims). The circuit court upheld the scoring in an opinion and order dated December 2, 2009. Harris filed a motion for rehearing, which the circuit court denied on March 5, 2010.

[21] *People v Harris*, unpublished order of the Court of Appeals, entered June 4, 2010 (Docket No. 297182).

[22] *People v Harris*, 488 Mich 955 (2010).

15

family court's determination of the child-support-arrearage amount as the restitution to be imposed in this criminal case or whether Harris had waived that issue.

## II. STANDARD OF REVIEW

These cases involve interpretation of a statute, a question of law that we review de novo on appeal.[23] The primary goal of statutory interpretation is to give effect to the intent of the Legislature.[24] The first step is to review the language of the statute itself.[25] If the statute is unambiguous on its face, the Legislature will be presumed to have intended the meaning expressed, and judicial construction is neither required nor permissible.[26] We review de novo constitutional issues.[27]

## III. ANALYSIS

All defendants argue that the circuit courts denied their constitutional right to due process when they refused to consider evidence of defendants' "inability to pay" as a defense to the charge of felony nonsupport. Only Likine explicitly equated her alleged inability to pay with a claim of impossibility.

---

[23] *In re MCI Telecom Complaint*, 460 Mich 396, 413; 596 NW2d 164 (1999).

[24] See *Farrington v Total Petroleum, Inc*, 442 Mich 201, 212; 501 NW2d 76 (1993).

[25] *House Speaker v State Admin Bd*, 441 Mich 547, 567; 495 NW2d 539 (1993).

[26] *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992).

[27] *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008).

16

## A. MCL 750.165

To evaluate defendants' arguments, we must first consider the relevant statute, MCL 750.165.[28] The operative language of the statute provides that "[i]f the court orders

---

[28] The statute provides, in its entirety:

(1) *If the court orders an individual to pay support* for the individual's former or current spouse, or *for a child of the individual, and the individual does not pay the support in the amount or at the time stated in the order, the individual is guilty of a felony* punishable by imprisonment for not more than 4 years or by a fine of not more than $2,000.00, or both.

(2) This section *does not apply unless* the individual ordered to pay support appeared in, or received notice by personal service of, the action in which the support order was issued.

(3) Unless the individual deposits a cash bond of not less than $500.00 or 25% of the arrearage, whichever is greater, upon arrest for a violation of this section, the individual shall remain in custody until the arraignment. If the individual remains in custody, the court shall address the amount of the cash bond at the arraignment and at the preliminary examination and, except for good cause shown on the record, shall order the bond to be continued at not less than $500.00 or 25% of the arrearage, whichever is greater. At the court's discretion, the court may set the cash bond at an amount not more than 100% of the arrearage and add to that amount the amount of the costs that the court may require under section 31(3) of the support and parenting time enforcement act, 1982 PA 295, MCL 552.631. The court shall specify that the cash bond amount be entered into the L.E.I.N. If a bench warrant under section 31 of the support and parenting time enforcement act, 1982 PA 295, MCL 552.631, is outstanding for an individual when the individual is arrested for a violation of this section, the court shall notify the court handling the civil support case under the support and parenting time enforcement act, 1982 PA 295, MCL 552.601 to 552.650, that the bench warrant may be recalled.

(4) The court may suspend the sentence of an individual convicted under this section if the individual files with the court a bond in the amount and with the sureties the court requires. At a minimum, the bond must be conditioned on the individual's compliance with the support order. If the court suspends a sentence under this subsection and the individual does not comply with the support order or another condition on the bond, the court

17

an individual to pay support . . . for a child of the individual, and the individual does not pay the support . . . , the individual is guilty of a felony . . . ."[29]

## B. *PEOPLE v ADAMS* AND MCL 750.165

In *People v Adams*, the defendant father, charged with felony nonsupport under MCL 750.165, sought to introduce evidence of his inability to pay as a defense to the charge. The circuit court permitted the defense, but the Court of Appeals reversed, holding that inability to pay is not a defense to felony nonsupport. To reach this conclusion, the Court of Appeals compared the current statutory language of MCL 750.165 with the statute's language before its amendment in 1999.[30] Before this amendment, the statute provided in relevant part:

> Where in any decree of divorce . . . the court shall order [a] husband to pay any amount to the clerk or friend of the court for the support of any wife or former wife . . . or father to pay any amount to the clerk or friend of the court for the support of [a] minor child or children, and said husband or

may order the individual to appear and show cause why the court should not impose the sentence and enforce the bond. After the hearing, the court may enforce the bond or impose the sentence, or both, or may permit the filing of a new bond and again suspend the sentence. The court shall order a support amount enforced under this section to be paid to the clerk or friend of the court or to the state disbursement unit.

(5) As used in this section, "state disbursement unit" or "SDU" means the entity established in section 6 of the office of child support act, 1971 PA 174, MCL 400.236. [MCL 750.165 (emphasis added).]

[29] MCL 750.165(1).

[30] After *Adams* was decided, 2004 PA 570 further amended MCL 750.165 to add subsection (3), which concerned cash bonds deposited by a defendant, see note 28 of this opinion, but that amendment would not have affected the *Adams* analysis and does not affect our analysis here.

father *shall refuse or neglect to pay* such amount at the time stated in such order *and shall leave the state* of Michigan, *said husband or father shall be guilty of a felony* . . . .[31]

Comparing the two versions of the statute, the Court of Appeals concluded that the current version of MCL 750.165, which did not have the language "shall refuse or neglect," contains no fault or intent element. Noting that the omission of language expressly requiring fault as an element did not end the court's inquiry, the *Adams* Court focused on whether the Legislature intended to require fault as a predicate to guilt.[32] Examining caselaw recognizing inability to pay as a defense to a charge under the earlier version of the statute,[33] the Court noted that the cases had "implied a criminal intent requirement into the statute."[34] The *Adams* Court rejected the applicability of that analysis to the language of the current statute:

> [I]n the current amended statute, in addition to deleting gender-specific references such as "husband" and "father" and the requirement that the person leave the state, the Legislature removed any reference to the individual's refusal or neglect to pay the support. Given the Legislature's

[31] MCL 750.165, as amended by 1939 PA 89 (emphasis added).

[32] *Adams*, 262 Mich App at 93. The Court listed "numerous factors that may be considered in deciphering this intent," including:

> (1) whether the statute is a codification of common law; (2) the statute's legislative history or its title; (3) guidance to interpretation provided by other statutes; (4) the severity of the punishment provided; (5) whether the statute defines a public-welfare offense, and the severity of potential harm to the public; (6) the opportunity to ascertain the true facts; and (7) the difficulty encountered by prosecuting officials in proving a mental state. [*Id*. at 93-94 (citations omitted).]

[33] *Id*. at 94-98.

[34] *Id*. at 96, discussing *People v Ditton*, 78 Mich App 610; 261 NW2d 182 (1977).

deletion of language relating to refusal or neglect, there is no longer wording in the statute that could be used to support a construction that would include a mens rea requirement. . . . Thus, an intent requirement cannot be implied in the absence of any language supporting such an interpretation.[35]

*Adams* recognized that the current version of the statute imposes criminal liability regardless of intent with the goal of ensuring protection of the public welfare, stating: "Criminal nonsupport is the type of crime that generally falls within the class of crimes for which no criminal intent is necessary. A law that requires a parent to support his child benefits not only the child but also the well-being of the community at large."[36]

We agree with the Court of Appeals' conclusion in *Adams* that MCL 750.165 imposes strict liability. Although strict-liability offenses are disfavored, there is no question that the Legislature may create such offenses without running afoul of constitutional concerns.[37] Consistently with *Adams*, we have stated that strict-liability crimes "regulate[] conduct under the state's police power to promote the social good, a course the Legislature may elect without requiring mens rea,"[38] which is a particular state of mind that the prosecution must prove the defendant had in order to secure a conviction.[39] In addition, we have recognized that "courts will infer an element of

---

[35] *Adams*, 262 Mich App at 96.

[36] *Id*. at 99.

[37] See *Lambert v California*, 355 US 225; 78 S Ct 240; 2 L Ed 2d 228 (1957); see also *Smith v California*, 361 US 147, 150; 80 S Ct 215; 4 L Ed 2d 205 (1959), and *People v Rice*, 161 Mich 657, 664; 126 NW 981 (1910).

[38] *People v Quinn*, 440 Mich 178, 187; 487 NW2d 194 (1992).

[39] See Black's Law Dictionary (7th ed).

criminal intent when an offense is silent regarding *mens rea* unless the statute contains an express or implied indication that the legislative body intended that strict criminal liability be imposed."[40] We agree with the holding in *Adams* that the revised language of MCL 750.165 evinces a clear legislative intent to dispense with the *mens rea* element and impose strict liability by eliminating the language regarding a defendant's "refus[al] or neglect" to pay the ordered support, and instead providing simply that if "the individual *does not pay* the support . . . the individual is guilty of a felony."

## C. COMMON-LAW DEFENSE OF IMPOSSIBILITY

Concluding that MCL 750.165 is a strict-liability offense, however, does not end our analysis. The *Adams* Court only addressed the defense of inability to pay and did not address the common-law defense of impossibility, which if proven negates the *actus reus* of a crime.[41] Generally, the commission of a crime requires both an *actus reus* and a

---

[40] *People v Kowalski*, 489 Mich 488, 499 n 12; 803 NW2d 200 (2011), citing *People v Tombs*, 472 Mich 446, 452-456; 697 NW2d 494 (2005); *United States v X-Citement Video, Inc*, 513 US 64; 115 S Ct 464; 130 L Ed 2d 372 (1994); *Staples v United States*, 511 US 600; 114 S Ct 1793; 128 L Ed 2d 608 (1994); and *Morissette v United States*, 342 US 246; 72 S Ct 240; 96 L Ed 288 (1952).

[41] However, we note that legal commentators have specifically discussed *Adams*, emphasizing the voluntary-act requirement in criminal law and the requisite possibility of performance in crimes of omission:

> It is axiomatic that crimes consist of a mental part (*mens rea*) and a physical part (the requirement of a voluntary act, or a failure to act when there was a duty to do so). It is possible, however, for a legislature to dispense with a *mens rea* requirement. . . .

> Nonetheless, [*Adams*] is more correctly framed as a voluntary act case rather than a mens rea case. An involuntary act—or an involuntary failure to act when there was a duty to do so—has never before been subject to punishment in American law. Indeed, more than 100 years ago

*mens rea*.[42]  Though a strict-liability crime includes no *mens rea* element, the *actus reus*, or wrongful act, remains an element of the crime.[43]  Specifically, a strict-liability offense requires the prosecution to prove beyond a reasonable doubt that the defendant committed the prohibited act, regardless of the defendant's intent and regardless of what the defendant actually knew or did not know.[44]

A defendant might defend against a strict-liability crime by submitting proofs either that the act never occurred or that the defendant was not the wrongdoer. Additionally, at common law, a defendant could *admit* that he committed the act, but defend on the basis that the act was committed involuntarily.[45]  Examples of involuntary

> the Michigan Supreme Court addressed this very issue, and concluded possibility of performance is an essential element in a failure-to-act offense. No one can be held criminally liable because of a bodily movement which is involuntary.  Nor can one be held criminally liable for failing to perform an act which one is incapable of performing. [Apol & Studnicki, Criminal law, 51 Wayne L R 653, 673-674 (2005), citing *Jenkinson*, 77 Mich 414 (1889).]

[42] See, e.g., *Morissette*, 342 US at 251 (noting American courts' early recognition of crime "as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand"); see also 4 Blackstone, Commentaries on the Laws of England, p *20, (stating that "to constitute a crime against human laws, there must be, first, a vicious will, and secondly, an unlawful act consequent upon such vicious will").

[43] The *actus reus* is "[t]he wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability[.] Black's Law Dictionary (8th ed).

[44] *Quinn*, 440 Mich at 188.

[45] See, e.g., *People v Freeman*, 61 Cal App 2d 110; 142 P2d 435 (1943) (finding no voluntary act when the defendant, after experiencing an epileptic seizure, became unconscious while driving, causing a fatal collision); *State v Hinkle*, 200 W Va 280, 282, 285-286; 489 SE2d 257 (1996) (finding no voluntary act when defendant lost

acts that, if proved, provide a defense against the *actus reus* element of a crime include reflexive actions,[46] spasms, seizures or convulsions,[47] and bodily movements occurring while the actor is unconscious or asleep.[48] The common thread running through these "involuntariness" defenses is that the act does not occur under the defendant's control, and thus the defendant was powerless to prevent its occurrence and cannot be held criminally liable for the act.[49]

---

consciousness while driving because of an undiagnosed brain disorder, causing a collision).

[46] See *People v Newton*, 8 Cal App 3d 359, 373; 87 Cal Rptr 394 (1970) (discussing loss of consciousness and "reflex shock condition" after the defendant sustained an abdominal gunshot wound).

[47] See, e.g., *State v Welsh*, 8 Wash App 719, 722-723; 508 P2d 1041 (1973) (stating, with regard to the element of intent, that there is no criminal liability for an unconscious act and explaining that "during a psychomotor seizure, a person is not conscious of his behavior; his actions are automatic").

[48] See 1 LaFave & Scott, Substantive Criminal Law, 2d ed, § 6.1(c), p 429; *State v Mishne*, 427 A2d 450, 455-57 (Me, 1981) (construing an intentional act as requiring awareness and consciousness); cf. *People v Decina*, 2 NY2d 133, 137-140; 157 NYS2d 558; 138 NE2d 799 (1956) (finding a voluntary act when the defendant, knowing he might, at any time, be subject to epileptic attacks and seizures, drove an automobile with nobody accompanying him, suffered a seizure, and caused a fatal collision).

[49] See 1 LaFave & Scott, § 6.1(c), p 429; see also Simester, *On the so-called requirement for voluntary action*, 1 Buff Crim L R 403, 419 (1998):

> [I]t may be helpful to consider what philosophers have had to say about voluntariness. In fact, there is surprisingly little analysis in the literature. Moreover, the existing analysis is not always of the same concept. One approach is to explain voluntariness as the opposite of involuntariness . . . . An alternative account is of voluntary behavior as *volitional* action—behavior which is intentional under some description, which is "done because the agent wants to do it." [Citation omitted.]

MCL 750.165, however, criminalizes an omission, or a failure to act. At common law, an established defense to a crime of omission is *impossibility*.[50] Like its counterpart, involuntariness, the centuries-old defense of impossibility derives from the English common-law courts.[51] For example, in 1843, the Queen's Bench considered a defendant's liability for failing to repair a portion of highway that had been rendered impassable when the surrounding sea encroached. The Chief Judge stated:

> Both the road which the defendant is charged with liability to repair, and the land over which it passes, are washed away by the sea. To restore the road, as [the defendant] is required to do, he must create a part of the earth anew. . . . here all the material of which a road could be made have been swept away by the act of God. Under those circumstances can the defendant be liable for not repairing the road? We want an authority for such a proposition; and none has been found.[52]

---

[50] See, e.g., *Willing v United States*, 4 US (4 Dall) 374, 376; 1 L Ed 872 (1804) (ruling in favor of defendants, who had argued in the district court that "'the law does not compel parties to impossibilities (*lex non cogit ad impossibilia*)'"); *Stockdale v Coulson*, 3 All ER 154 (1974) (allowing appeal and quashing conviction after finding that it was impossible for a company's director and secretary to comply with a statutory requirement to attach documents that did not exist); *Regina v Hogan*, 169 ER 504, 505; 2 Den 277 (1851) (noting that in order to convict a parent of neglect, it must be shown that the parent "had the means of supporting [the child].")

[51] Recognizing the roots of impossibility in early common law, Chief Justice Edward Coke stated in *Dr Bonham's Case*, 8 Co Rep 113b, 118a; 77 Eng Rep 646 (1610), that "when an act of parliament is against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such act to be void."

[52] *Regina v Bamber*, 5 QB 279, 287; 114 ER 1254 (1843) (comment by Denman, C.J.). Judge Wightman noted that there had been "no allegation on the record that [the defendant's] duty [was] to keep the sea out." *Id.* at 286.

The Queen's Bench, then, recognized impossibility of performance as a defense to a charge involving an omission.[53] Like the involuntariness defense to crimes that penalize an affirmative act, the defense of impossibility to crimes that penalize an act of omission must be based on something outside the defendant's control:

> Obviously, the involuntariness of omissions cannot be explained in precisely the same way as for actions. It would be odd indeed to talk of a reflex or convulsive omission. Nonetheless, even for omissions the criminal law requires that [a defendant] must be responsible for her behavior before she commits the actus reus of a crime. [The defendant's] omission is involuntary, and her responsibility for the actus reus is negated, when she fails to discharge a duty to intervene because it was *impossible* for her to do so.[54]

Stated differently, a defendant cannot be held criminally liable for failing to perform an act that was impossible for the defendant to perform.[55] When it is genuinely *impossible* for a defendant to discharge a duty imposed by law, the defendant's failure is excused.[56]

---

[53] See *The Generous*, 2 Dods 322, 323 (1818), in which Sir William Scott stated, "But the law itself, and the administration of it, must yield to that to which every thing must bend — to necessity. The law, in its most positive and peremptory injunctions, is understood to disclaim, as it does in its general aphorisms, all intention of compelling them to impossibilities; and the administration of law must adopt that general exception in the consideration of all particular cases." See also *In re Bristol and N S R Co*, 3 QBD 10, 13 (1877) (declining to issue a writ of mandamus to enforce a statutory duty that was "impossible" for the railway to discharge because doing so "would be contrary to the elementary principles of justice") (comment of Cockburn, C.J.).

[54] Simester, 1 Buff Crim L R, p 417.

[55] 1 LaFave & Scott, § 6.2(c), p 446 (recognizing the defense, but emphasizing that "impossibility means impossibility"); see also *United States v Spingola*, 464 F2d 909, 911 (CA 7, 1972) (holding that "[g]enuine impossibility is a proper defense to a crime of omission").

[56] See Williams, Criminal Law: The General Part (2d ed), § 240, p 747 (stating that "[i]t may be laid down as a general proposition that where the law imposes a duty to act, non-

Michigan common law, which has its roots in the English common law, has also long recognized impossibility as a defense to crimes of omission. In *Port Huron v Jenkinson*,[57] this Court considered a city ordinance that criminalized a property owner's failure to repair sidewalks running adjacent to his or her property if the city requested the property owner to make the repair. *Jenkinson* recognized impossibility as a defense, holding that the defendant could not be criminally convicted of failing to perform a legally required duty when it was impossible for him to do so. The Court in *Jenkinson* stated:

> *No legislative or municipal body has the power to impose the duty of performing an act upon any person which it is impossible for him to perform, and then make his non-performance of such a duty a crime, for which he may be punished by both fine and imprisonment.* It needs no argument to convince any court or citizen, where law prevails, that this cannot be done; and yet such is the effect of the provisions of the statute and by-law under consideration. It will readily be seen that a tenant occupying a house and lot in the city of Port Huron, and so poor and indigent as to receive support from his charitable neighbors, if required by the city authorities to build or repair a sidewalk along the street in front of the premises he occupies, and fails to comply with such request, such omission becomes criminal; and, upon conviction of the offense, he may be fined and imprisoned. It is hardly necessary to say these two sections of the statute are unconstitutional and void, and that the provisions are of no force

compliance with the duty will be excused where compliance is physically impossible"). We first recognized that impossibility is a defense to a strict-liability crime 123 years ago in *Jenkinson*, 77 Mich 414, a discussion of which follows.

[57] *Port Huron v Jenkinson*, 77 Mich 414; 43 NW 923 (1889); see also *Benton Harbor v St Joseph & B H Street R Co*, 102 Mich 386, 390-391; 60 NW 758 (1894) (recognizing impossibility as a defense when the respondent "cannot procure funds" to pave within its rails and the roadway, as required by ordinance; "that it is an utter impossibility to do what it is asked to have done; that it cannot pay [its] current expenses; and . . . that a writ of *mandamus* will not issue to compel the performance when it is apparent that the parties against whom it is to be directed have no power to comply therewith").

26

or effect. They are obnoxious to our Constitution and laws; and the two sections of the statute are a disgrace to the legislation of the State.[58]

The Court specifically held that a legislative body cannot require a person to perform an act that "is impossible for him to perform" and then impose criminal penalties for the failure to perform that act.[59] *Jenkinson*, then, recognized common-law impossibility as a defense to a criminal omission.

## D. IMPOSSIBILITY AS A DEFENSE TO FELONY NONSUPPORT

The language of MCL 750.165 provides no indication that the Legislature intended to abrogate common-law impossibility as a defense to felony nonsupport.[60] Consistently with the Michigan Constitution and absent a clear legislative intent to abolish the common law, we thus presume that the common-law defense of impossibility remains available if supported by sufficient evidence.[61] Accordingly, we hold that

---

[58] *Jenkinson*, 77 Mich at 419-420 (emphasis added).

[59] *Id.* at 419.

[60] The Michigan Constitution provides that "[t]he common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." Const 1963, art 3, § 7.

[61] *People v Dupree*, 486 Mich 693, 705-706; 788 NW2d 399 (2010). The operative language of MCL 750.165(1), which states that "[i]f the court orders an individual to pay support . . . for a child of the individual, and the individual does not pay the support . . . , the individual is guilty of a felony," reflects no intent to abrogate the traditional common-law defense of impossibility. Our decision in *Jenkinson* and the common-law principles recognizing the defense of impossibility form the matrix within which the Legislature enacted MCL 750.165 given that "'the Legislature is presumed to be aware of judicial interpretations of existing law when passing legislation.'" *People v Lowe*, 484 Mich 718, 729; 773 NW2d 1 (2009), quoting *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 439-440; 716 NW2d 247 (2006).

27

genuine impossibility is a defense to the charge of felony nonsupport under MCL 750.165.[62] Just as a defendant cannot be held criminally liable for committing an act that he or she was powerless to prevent, so, too, a defendant cannot be held criminally liable for failing to perform an act that was genuinely *impossible* for the defendant to perform.

Although English and Michigan common law both recognize that impossibility may be raised as a defense to a crime of omission, neither provides any particularized guidance regarding the quantum of evidence necessary to establish impossibility. These common-law cases establish impossibility as a defense in cases in which a defendant was genuinely unable to perform a legally required act or, as in the English case involving restoration of a road washed away by the sea, when compliance was physically impossible. However, "it is somewhat surprising to find that if impossibility in the modern context is examined more closely, its position is confused and its function unclear."[63]

In considering the parameters of the impossibility defense, we find instructive the United States Supreme Court's decision in *Bearden v Georgia*,[64] which considered the constitutionality of revoking a criminal defendant's probation for failure to pay a fine. In *Bearden*, the petitioner was ordered to pay a $500 fine and $250 in restitution as

---

[62] At oral argument, the Attorney General conceded that the common-law defense of impossibility remained available to a defendant charged with felony nonsupport but stated that none of these defendants "come[s] even close" to establishing impossibility.

[63] Smart, *Criminal responsibility for failing to do the impossible*, 103 L Q R 532, 533 (1987).

[64] *Bearden v Georgia*, 461 US 660; 103 S Ct 2064; 76 L Ed 2d 221 (1983).

conditions of his probation.[65]  He was then laid off from his job and, despite repeated efforts, was unable to find other work.  When the petitioner's remaining payments were late, the state revoked his probation because he had not paid the balance.  The record from the probation-revocation hearing indicated that the petitioner had been unable to find employment and had no assets or income.[66]  The Court held that if a fine is determined to be the appropriate penalty for a crime, the state cannot "imprison a person solely because he lacked the resources to pay it."[67]  Rather, there must be "evidence and findings that the defendant was somehow responsible for the failure . . . ."[68]  *Bearden* directed sentencing courts to consider the reasons for nonpayment and carefully "inquire into the reasons for the failure to pay":[69]

> This distinction, based on the reasons for nonpayment, is of critical importance here.  If the probationer has willfully refused to pay the fine or restitution when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection.  *Similarly, a probationer's failure to make sufficient bona fide efforts to seek employment or borrow money in order to pay the fine or restitution* may reflect an insufficient concern for paying the debt he owes to society for his crime.  In such a situation, the State is likewise justified in revoking probation and using imprisonment as an appropriate penalty for the offense.[70]

---

[65] *Id*. at 662.

[66] *Id*. at 662-663.

[67] *Id*. at 667-668.

[68] *Id*. at 665.

[69] *Id*. at 668, 672.

[70] *Id*. at 668-669 (emphasis added; citations omitted).

*Bearden* indicated that "if the probationer has made *all reasonable efforts to pay* the fine or restitution, and yet cannot do so *through no fault of his own*, it is fundamentally unfair to revoke probation automatically . . . ."[71] The Court held that a "*lack of fault* provides a 'substantial reason which justifies or mitigates the violation' and makes revocation inappropriate."[72]

We recognize that the Court in *Bearden* dealt with probation revocation for nonpayment of a fine, as opposed to the felony nonsupport at issue in this case, but we are guided by the Court's reasoning, which inquires into and considers an individual's efforts to make a legally required payment. Thus, we hold that to establish an impossibility defense for felony nonsupport, a defendant must show that he or she acted in good faith and made *all reasonable efforts* to comply with the family court order, but could not do so through no fault of his or her own. In our view, "sufficient bona fide

---

[71] *Id*. at 668.

[72] The formulation articulated in *Bearden* is largely consistent with *The Generous*, 2 Dods at 323-324:

> [T]he nature of the necessity pleaded [must] be such as the law itself would respect; for there may be a necessity which it would not. A necessity created by a man's own act, with a fair previous knowledge of the consequences that would follow, and under circumstances which he had then a power of controuling, is of that nature.

Moreover,

> the party who was so placed [must have] used all practicable endeavours to surmount the difficulties which already formed that necessity, and which on fair trial he found insurmountable. I do not mean all the endeavours which the wit of man, as it exists in the acutest understanding, might suggest, but such as may reasonably be expected from a fair degree of discretion and an ordinary knowledge of business. [*Id*. at 324.]

efforts to seek employment or borrow money in order to pay" certainly are expected, but standing alone will not necessarily establish an impossibility defense to a charge under MCL 750.165. Instead, defendants charged with felony nonsupport must make *all reasonable efforts*, and use all resources at their disposal, to comply with their support obligations. For the payment of child support to be truly impossible, a defendant must explore and eliminate all the reasonably possible, lawful avenues of obtaining the revenue required to comply with the support order. Defendants must not only establish that they cannot pay, but that theirs are among the exceptional cases in which it was not reasonably *possible* to obtain the resources to pay. A defendant's failure to undertake those efforts reflects "an insufficient concern for paying the debt"[73] one owes to one's child, which arises from the individual's responsibility as a parent.

To determine whether a defendant has established impossibility in the context of a felony nonsupport case, we provide, for illustrative purposes only, a nonexhaustive list of factors for courts to consider.[74] These should include whether the defendant has diligently sought employment; whether the defendant can secure additional employment, such as a second job; whether the defendant has investments that can be liquidated; whether the defendant has received substantial gifts or an inheritance; whether the defendant owns a home that can be refinanced; whether the defendant has assets that can be sold or used as loan collateral; whether the defendant prioritized the payment of child

---

[73] *Id.*

[74] Relevant to this inquiry is the defendant's conduct at the family court proceedings, including providing appropriate documentation, and compliance with the family court's order, which we will discuss later in this opinion.

support over the purchase of nonessential, luxury, or otherwise extravagant items; and whether the defendant has taken reasonable precautions to guard against financial misfortune and has arranged his or her financial affairs with future contingencies in mind, in accordance with one's parental responsibility to one's child.[75] The existence of unexplored possibilities for generating income for payment of the court-ordered support suggests that a defendant has not raised a true impossibility defense, but merely an

---

[75] This list is not intended to be exhaustive or exclusive, but instead sets forth factors that courts may use to consider whether a defendant charged under MCL 750.165 has presented evidence that might demonstrate genuine impossibility. We emphasize that the factfinder's inquiry into the basis for an impossibility claim is broader in scope than that necessitated by a mere claim of "inability to pay." Inability to pay may be an evidentiary factor that can be used in support of an impossibility defense, but, standing alone, it is insufficient to show impossibility. For example, evidence that is corroborated or documented, by whatever means may be available, that the defendant has exhausted all of his or her monetary resources, does not possess (or has been unable to find a buyer for or lender against) assets that could be sold or pledged to obtain the means to satisfy the support obligation, and has made all reasonable efforts to secure employment to satisfy the support obligation may, in the absence of persuasive contradictory evidence, satisfy the strict requirements of the impossibility defense we recognize here.

To provide an illustration of an extreme example, in our view, a person who was unexpectedly hospitalized or underwent emergency surgery may be able to meet the exacting standard of the impossibility defense if, through no fault of that person's own, he or she could not physically or financially make the court-ordered support payment. See Williams, Criminal Law, § 240, p 747 (discussing physical impossibility). We underscore, however, that this must involve some element of unexpectedness and circumstances beyond the defendant's control that make it truly impossible to meet the support obligation. Thus, one who, knowing that he or she is about to undergo major surgery that may have debilitating consequences, nevertheless takes no steps to ensure that a known support obligation is met during a period of convalescence will be situated differently from one who is suddenly injured or unexpectedly incapacitated. See, e.g., *Bamber*, 5 QB at 287 (referring to an "act of God" causing encroachment by the sea). What will be sufficient to establish impossibility in a given case will depend on the individual circumstances of the particular defendant, but passivity, neglect, or failure to plan for parental financial obligations will not excuse neglected parental responsibility.

assertion of inability to pay. A defendant's failure to explore every reasonably possible avenue in order to pay his or her support obligation not only reflects "an insufficient concern for paying the debt he owes to society,"[76] it also reflects an insufficient concern for the child. In those instances, the defendant may not invoke the shield of the impossibility defense.

## E. PROCEDURAL ASPECTS OF THE IMPOSSIBILITY DEFENSE TO FELONY NONSUPPORT

Having explored the substantive parameters of the impossibility defense, we turn to procedural considerations governing its invocation. To be entitled to a jury instruction on this affirmative defense,[77] a defendant must present prima facie evidence from which the finder of fact could conclude that it was genuinely impossible for the defendant to pay the support, as described in part III(D). [78] If, however, no reasonable trier of fact could conclude from the facts adduced that payment of the support was truly impossible, then

---

[76] *Bearden*, 461 US at 668.

[77] An affirmative defense admits the crime but seeks to *excuse* or *justify* its commission. It does not negate specific elements of the crime. *People v Lemons*, 454 Mich 234, 246 n 15; 562 NW2d 447 (1997); see also *People v Pegenau*, 447 Mich 278, 319; 523 NW2d 325 (1994) (BOYLE, J., concurring) ("[A]n affirmative defense in effect concedes the facial criminality of the conduct and presents a claim of justification or excuse . . . .").

[78] See *Martin v Ohio*, 480 US 228, 230; 107 S Ct 1098; 94 L Ed 2d 267 (1987) (upholding Ohio statute placing the burden of producing evidence supporting an affirmative defense on the defendant), *Dupree*, 486 Mich at 709-710, and *Lemons*, 454 Mich at 248.

the defendant is not entitled to the instruction.[79]  Assuming a defendant has made this

threshold showing and is entitled to an instruction, then the defendant may be exonerated

if the trier of fact finds that the defendant has established[80] by a preponderance of the

evidence[81] that it was genuinely impossible for him or her to comply with the family

court order for each and every violation within the relevant charging period.[82]

Clearly, the record of the defendant's conduct and responses in the family court

proceedings is relevant to determining the possibility of compliance with the support

order and is relevant to evaluating the defendant's good-faith efforts.  Consequently, and

in addition to any other relevant evidence, both the defense and the prosecution may rely

---

[79] *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995) ("A trial court is required to give a requested instruction [for a defense theory], except where the theory is not supported by evidence.").

[80] At common law, the burden of proving an affirmative defense rested on the defendant. *Patterson v New York*, 432 US 197, 202; 97 S Ct 2319; 53 L Ed 2d 281 (1977); *Commonwealth v York*, 50 Mass 93 (1845).  See 4 Blackstone, p *202:

> And all these circumstances of justification, excuse or alleviation, it is incumbent upon the prisoner to make out, to the satisfaction of the court and jury: the latter of whom are to decide whether the circumstances alleged are proved to have actually existed; the former, how far they extend to take away or mitigate the guilt.

[81] The United States Supreme Court has upheld the constitutionality of requiring a defendant to prove an affirmative defense as long as the defendant does not have the burden of disproving any of the elements included by the state in its definition of the crime.  See *Patterson*, 432 US at 210; *Martin*, 480 US at 232.  Although the prosecution must prove the elements of the crime beyond a reasonable doubt, the defendant bears the burden of proving the affirmative defense by a preponderance of the evidence. *Patterson*, 432 US at 206; *Martin*, 480 US at 232.

[82] *People v Monaco*, 474 Mich 48, 56-57; 710 NW2d 46 (2006).

on the evidentiary record from the family court proceedings. For example, evidence that the defendant was not truthful in the family court proceeding or that the defendant hid assets, failed to provide accurate documentation of the resources and assets at his or her disposal, was voluntarily unemployed or underemployed, failed to exhaust all reasonable and lawful means of generating the income necessary to satisfy the support obligation, or failed to seek timely modification of the family court order when it became evident that it could not be performed may, singly or in combination, defeat any claim that it was impossible for the defendant to comply with the court order.

Given our description of how evidence from the family court proceedings may be used, we obviously disagree with the Attorney General's contention that the family court's determination of what amount a defendant is capable of paying precludes a defendant from asserting impossibility as a defense to felony nonsupport in the criminal proceeding. Although the criminal nonsupport charge flows from a defendant's noncompliance with the family court's support order, the criminal proceeding on a charge of felony nonsupport is separate and distinct from the family court proceeding. Therefore, the outcome of the family court proceeding simply does not preclude a defendant in a criminal proceeding for felony nonsupport from asserting impossibility as a defense.[83] By the same logic, the criminal proceeding does not provide a defendant

---

[83] See, e.g., *Hicks ex rel Feiock v Feiock*, 485 US 624, 627-629; 108 S Ct 1423; 99 L Ed 2d 721 (1988) (accepting the state court's determination that ability to comply with a court order is an affirmative defense rather than an element of the offense of contempt); *Davis v Barber*, 853 F2d 1418, 1427-1428 (CA 7, 1988) (finding no violation of due process when the state put the burden of proof on the defendant to show financial inability in a criminal nonsupport case).

with the opportunity to attack the legitimacy or accuracy of the family court's support order or the validity of its underlying findings.[84] In the family court proceeding, the amount of support ordered is determined under the "preponderance of the evidence" standard. Neither the support order nor evidence of a defendant's failure to pay introduced in family court proceedings, singly or together, establishes proof beyond a reasonable doubt that a defendant is guilty of felony nonsupport. Rather, because a charge of felony nonsupport is addressed only in a criminal proceeding, it invokes the full panoply of constitutional protections that inhere in any criminal prosecution, which are simply inapplicable in civil family court proceedings.

In a criminal proceeding, the defendant has a constitutional right to have the prosecution prove his or her guilt beyond a reasonable doubt and to have a jury determine his or her guilt or innocence, as well as the merits of the impossibility defense, if applicable, in accordance with that standard of proof. These protections are fundamental to a defendant's right to a jury trial. As the Supreme Court stated in *Stevenson v United States*:

> [S]o long as there is some evidence upon the subject [of whether the defendant was guilty of manslaughter rather than murder], the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might [support the defense], *it then became a proper question for the jury to say whether the evidence were true* . . . . The evidence might appear to the court to be simply overwhelming to show [the defendant's guilt], and yet, so long as there was some evidence relevant to the issue of [the defense], *the*

---

[84] Michigan law does not permit the retroactive modification of support orders. MCL 552.603(2); *Malone v Malone*, 279 Mich App 280, 288-289; 761 NW2d 102 (2008).

*credibility and force of such evidence must be for the jury*, and cannot be matter of law for the decision of the court.[85]

Indeed, "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies"[86] is equally fundamental in a prosecution for the strict-liability offense of felony nonsupport once the defendant has crossed the high evidentiary threshold required to present the affirmative defense of impossibility to the jury.

We emphasize that nothing in our opinion today undermines the validity of the family court proceeding or its role in setting the amount of child support. We simply wish to make clear that different procedural safeguards exist in family court proceedings than in the criminal proceedings that may flow from the family court's orders and that courts must be cognizant of these distinctions.

## 1. APPLICATION TO *LIKINE*

In this case, Likine raised and preserved the impossibility defense in the circuit court. Accordingly, we review this preserved claim of constitutional error to determine whether the party benefitting from the error has established that it is harmless beyond a reasonable doubt.[87]

The evidence that Likine sought to introduce, which the circuit court did not allow, relates to her mental illness, incapacitation, and disability. This evidence—if

---

[85] *Stevenson v United States*, 162 US 313, 314-315; 16 S Ct 839; 40 L Ed 980 (1896) (emphasis added).

[86] *Washington v Texas*, 388 US 14, 19; 87 S Ct 1920; 18 L Ed 2d 1019 (1967).

[87] *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

submitted to, and believed by, a jury—might establish impossibility. Under the circumstances, and on the current undeveloped state of the record, we cannot conclude that the error was harmless beyond a reasonable doubt. We therefore reverse the judgment of the Court of Appeals in this case and remand *Likine* to the circuit court for a new trial.

## 2. APPLICATION TO *PARKS*

Parks neither asserted nor sought to assert an impossibility defense at his criminal trial for felony nonsupport. He asserted for the first time in the Court of Appeals that his inability to pay was a defense to the charge of felony nonsupport, and although he cited caselaw recognizing impossibility as a common-law defense, he failed to clearly assert an impossibility defense at his trial. Accordingly, we review this unpreserved claim of constitutional error for plain error affecting a substantial right.[88] Under the facts in this case, we cannot say that plain error occurred because Parks never claimed that it was impossible to comply with his child support obligation. Therefore, we affirm the judgment of the Court of Appeals in *Parks*.

## 3. APPLICATION TO *HARRIS*

Harris entered an unconditional guilty plea to the charge of felony nonsupport under MCL 750.165. An unconditional guilty plea that is knowing and intelligent waives claims of error on appeal, even claims of constitutional dimension.[89] He therefore failed to preserve the constitutional issue presented in this case, and he actually admitted the

---

[88] *Id*. at 764-765.

[89] *People v New*, 427 Mich 482, 491-492; 398 NW2d 358 (1986).

factual basis for his guilt. Accordingly, we conclude that the circuit court did not abuse its discretion by refusing to allow Harris to withdraw his plea, and he is therefore not entitled to relief.[90]

## IV. RESPONSE TO THE DISSENT

The dissent endorses an "inability to pay" defense to felony nonsupport and suggests that the impossibility defense we have recognized is "problematic" and "newly minted."[91] In our judgment, these assertions are belied by our reliance on caselaw dating to the seventeenth century recognizing this well-established common-law defense.[92] Notably, although the dissent apparently dislikes this defense, it does not contest that impossibility is, in fact, a defense to MCL 750.165.[93] Indeed, it is beyond dispute that

---

[90] In light of our conclusion that Harris was not entitled to withdraw his plea, our discussion in part III(E) of the weight to be accorded to the evidentiary record in the family court proceeding, and the absence of any persuasive argument in Harris's brief on appeal regarding the arrearage amount, Harris is not entitled to relief on that issue.

[91] *Post* at 9-10. The dissent mischaracterizes our impossibility defense, referring to it as an "impossibility-to-pay defense." Of course, the impossibility defense that we recognize today, contrary to the dissent's appellation, is the traditional, common-law impossibility defense, which takes into account and thereby subsumes the inability-to-pay inquiry, which is the sole consideration for the dissent. The impossibility defense is not a singular inquiry relating only to ability or inability to pay, but instead considers several relevant factors surrounding a particular defendant's circumstances.

[92] See part III(C) of this opinion. The dissent also analyzes the distinction between legal and factual impossibility, which is irrelevant and unhelpful here because this distinction pertains only to attempt crimes.

[93] Thus, it is unclear whether the dissent's inability-to-pay defense is its version of the impossibility defense or whether it is an additional defense to the crime of felony nonsupport. The dissent's description of the inability-to-pay defense, *post* at 18 ("a defendant would have to show that he or she has made all reasonable and good-faith efforts to comply with the support order, but could not"), is actually similar to our description of the impossibility defense, *supra* at 30 ("a defendant must show that he or

impossibility is a centuries-old common-law defense—recognized in Michigan at least since *Jenkinson*—that attacks the *actus reus* element of a crime of omission.[94] It is also beyond dispute that MCL 750.165 is a crime of omission and that the Legislature has not abrogated this defense.[95]

Additionally, the dissent agrees that MCL 750.165 is a strict-liability offense. Yet the dissent would return the law of Michigan to the precise state that existed *before* the Legislature amended MCL 750.165 and made felony nonsupport a strict-liability offense, contrary to the Legislature's clear intent.[96] To further support its position, the dissent

she acted in good faith and made *all reasonable efforts* to comply with the family court order, but could not do so through no fault of his or her own").

[94] The dissent misconstrues *Jenkinson* as endorsing an inability-to-pay defense. The dissent, however, does not deny that *Jenkinson* recognized the defense of impossibility and implicitly recognizes that, under *Jenkinson*, inability to pay is *part of the analysis* for this defense. Because our impossibility standard, like that in *Jenkinson*, incorporates inability to pay as a consideration of the impossibility defense, it is illogical to conclude, as the dissent does, that our impossibility defense is unconstitutional under *Jenkinson*.

[95] The dissent's observation that neither version of the nonsupport statute provides a defense to the charge merely states the obvious and does not change our recognition of the common-law defense of impossibility in light of the lack of any indication in the statutory language that the Legislature intended to abrogate this defense.

[96] The dissent relies on legislative acquiescence, "'a highly disfavored doctrine of statutory construction,'" *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 177 n 33; 615 NW2d 702 (2000), quoting *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999) to support its conclusion that the "inability-to-pay" defense remains intact after the 1999 amendment to the statute. We could just as easily apply the doctrine of legislative acquiescence to conclude that the Legislature intended to eliminate inability to pay as a defense to the strict-liability crime of felony nonsupport because the Legislature took no action after the Court of Appeals' 2004 decision in *Adams*. The reason the dissent reaches the former conclusion, and not the latter, can only be attributed to the dissent's policy preference. Indeed, that equally plausible conclusions can be reached by applying this doctrine demonstrates the malleable and problematic nature of inferring legislative intent from the Legislature's inaction. It is precisely for this reason

relies on out-of-state authorities, which it asserts demonstrate that Michigan is the only state that does not recognize inability to pay as a defense to a charge of felony nonsupport. In support of this assertion, the dissent provides a 3½-page-long footnote directly replicated from Likine's brief on appeal.[97] However, the state statutes and caselaw cited in the footnote are inapposite because they involve statutes that are materially different from Michigan's felony-nonsupport statute.[98] More importantly, a closer examination makes plain that the dissent's claim that we are the only state *not* to recognize inability to pay as a defense to nonsupport is simply not so. For example, the footnote cites a 1924 case from Virginia in which the court indeed referred to the defendant's "absolute inability" to contribute, but then concluded that it was clearly established "that his mental and physical condition has made it *impossible* for him to support his wife and children ever since his first conviction . . . ."[99] In our view, this sounds remarkably like the impossibility defense we recognize here.[100] Indeed, contrary

that the doctrine is disfavored. "[S]ound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence." *Donajkowski*, 460 Mich at 261. Consistently with this principle, our decision recognizes the common-law impossibility defense because, as we discussed in part III(D) of this opinion, there is no indication that the Legislature intended to abrogate this common-law defense.

[97] See *post* at 19 n 52; compare Likine's brief on appeal, pp 11-16 n 4.

[98] This point is evidenced by the fact that several of the other states' criminal nonsupport statutes contain elements (such as willfulness) or language (such as "without excuse") that are conspicuously absent from our statute. For further discussion, see note 101 of this opinion.

[99] *Painter v Commonwealth*, 140 Va 459; 124 SE 431, 432 (1924) (emphasis added).

[100] See also DC Code 46-225.02(d), which states:

41

to the dissent's overstatement, only 10 states *explicitly* provide that inability to pay is an

affirmative defense to nonsupport.[101]  Moreover, under Michigan law, the family court

> For purposes of this section, failure to pay child support, as ordered, shall constitute prima facie evidence of a willful violation. This presumption may be rebutted if the obligor was incarcerated, hospitalized, or had a disability during the period of nonsupport. These circumstances do not constitute an exhaustive list of circumstances that may be used to rebut the presumption of willfulness.

We note that this statute enumerates factors for rebutting the willfulness element contained in that statute that are similar to those we set forth in our decision today.  It is also apparent that at least two states referred to in the footnote actually recognize what is more accurately characterized as an impossibility defense like the one we recognize today.  See *Painter*, 140 Va 459; see also *Epp v State*, 107 Nev 510, 514; 814 P2d 1011 (1991) (stating, in language strikingly similar to that used in *Jenkinson*, "[o]bviously, 'the law does not contemplate punishing a person for failing to do a thing which he cannot do'") (citation omitted).

[101] See Ariz Rev Stat Ann 25-511B ("It is an affirmative defense to a charge of [failure to provide for one's child] that the defendant . . . was unable to furnish reasonable support."); Colo Rev Stat 14-6-101 ("It shall be an affirmative defense . . . to a prosecution [for felony nonsupport] that owing to physical incapacity or other good cause the defendant is unable to furnish the support . . . ."); Del Code Ann tit 11, § 1113(d) ("In any prosecution for criminal nonsupport or aggravated criminal nonsupport, it is an affirmative defense that the accused was unable to pay or provide support . . . ."); Minn Stat 609.375(8) ("It is an affirmative defense to criminal liability [for nonsupport of spouse or child] if the defendant proves by a preponderance of the evidence that the omission and failure to provide care and support were with lawful excuse."); ND Cent Code 12.1-37-01(4) ("It is an affirmative defense to a charge [of failure to support a child] that the defendant suffered from a disability during the periods an unpaid child support obligation accrued . . . ."); Ohio Rev Code Ann 2919.21(D) ("It is an affirmative defense to a charge of failure to provide adequate support . . . that the accused was unable to provide adequate support . . . ."); Tex Penal Code Ann 25.05(d) ("It is an affirmative defense to prosecution [for criminal nonsupport] that the actor could not provide support for the actor's child."); Utah Code Ann 76-7-201(5)(a) ("[I]t is an affirmative defense [to criminal nonsupport charges] that the accused is unable to provide support."); Wis Stat 948.22(6) ("[A]ffirmative defenses [to failure to support charges] include but are not limited to inability to provide child, grandchild or spousal support."); Wyo Stat Ann 20-3-101(c) ("It is an affirmative defense . . . that the person was unable to provide adequate support . . . ").  In addition, three other states, although not explicitly recognizing ability

to pay as an affirmative defense, specifically recognize inability to pay as a defense to nonsupport. See Ind Code 35-46-1-5(d) (providing that "[i]t is a defense [to charges of nonsupport of a dependent child] that the accused person was unable to provide support"); *Rogers v Commonwealth*, 321 SW2d 779, 781 (Ky, 1959) (stating that "[p]hysical disability and financial inability have been recognized as defenses to a prosecution under the child desertion statute"); La Rev Stat Ann 14:74B(1) (providing that "[p]hysical incapacity which prevents a person from seeking any type of employment constitutes a defense to the charge of [nonsupport]").

Further, the dissent includes within the footnote states that do not specifically recognize an inability-to-pay defense, but instead consider a parent's ability to pay *within the criminal proceeding*. This is not the same as a defense of inability to pay. See Cal Penal Code 270 (specifically considering, in language cited by the dissent, parents' income and also whether the act or omission "is willful and without lawful excuse"); *Elam v State*, 138 Ga App 432, 432; 226 SE2d 290 (1976) (considering "evidence as to [defendant's] financial condition which tended to negate the element of wilfulness"); Mass Gen Laws ch 273, § 1(4) (providing that a parent is guilty of a felony for failing to comply with a child-support order or judgment "wilfully and while having the financial ability or earning capacity to have complied").

Other states explicitly include ability to pay, or willful failure to pay, *as an element of the offense*. Again, this is not the same as an inability-to-pay defense. Representative states mentioned in the footnote that do not explicitly recognize an inability-to-pay defense but include an element of willfulness or knowledge and also consider ability to pay as part of the criminal charge are Ala Code 13A-13-4 (imposing liability for "intentionally fail[ing] to provide support which that person is able to provide"); Alas Stat 11.51.120(a) (imposing liability for a "knowing[] fail[ure], without lawful excuse, to provide support for the child"); *Nelke v State*, 19 Ark App 292, 294; 720 SW2d 719 (1986) (stating that "[i]n order to make out the offense, the State must show a willful or negligent failure to provide, not a mere failure because of inability" and noting other states' holdings that "the inability to pay cannot be brought about intentionally and willfully by the defaulting parent") (citations omitted); Fla Stat 827.06(2) (imposing liability on "[a]ny person who willfully fails to provide support which he or she has the ability to provide"); *Elam*, 138 Ga App at 432 (noting the statutory requirement that the act "be done 'wilfully and voluntarily'" to support the imposition of liability); Hawaii Rev Stat 709-903(a) (imposing liability when a "person knowingly and persistently fails to provide support which the person can provide"); *State v Krumroy*, 22 Kan App 2d 794, 800; 923 P2d 1044 (1996) (considering Kan Stat Ann 21-3605 and noting that "[t]he issue of whether Krumroy failed to support his child without lawful excuse or without just cause is broader than determining whether he had sufficient income to provide support"); Md Code Ann, Fam Law 10-203(a) (stating that

considers parents' ability to pay *when it sets the child support obligation in the first place*.[102]

After this flawed legal analysis, the dissent posits what appears to be its primary objection to this opinion: its claim that our impossibility standard "offends traditional

"[a] parent may not willfully fail to provide for the support of his or her minor child"); Miss Code Ann 97-5-3 (imposing felony liability for "[a]ny parent who shall desert or wilfully neglect or refuse to provide for the support and maintenance of his or her child or children"); NH Rev Stat Ann 639:4 (stating that "[a] person is guilty of non-support if such person knowingly fails to provide support . . . which such person can provide"); NJ Stat Ann 2C:24-5 (providing for criminal liability for a person who "willfully fails to provide support which he can provide and which he knows he is legally obliged to provide"); NY Penal Law 260.05(1) (providing for criminal liability for nonsupport for a person who "fails or refuses without lawful excuse to provide support for such child when he or she is able to do so"); *State v McMillan*, 10 NC App 734, 735-736; 180 SE2d 35 (1971) (stating that "'the failure by a defendant to provide adequate support for his child must be wilful, that is, he intentionally and without just cause or excuse does not provide adequate support for his child according to his means and station in life, and this essential element of the offense must be alleged and proved'") (citation omitted); Okla Stat tit 21, § 852 (imposing criminal liability for a parent who "willfully omits, without lawful excuse, to furnish . . . child support"). Clearly, consideration of a parent's ability to pay, or legislative prescription of ability to pay as an element of the offense, does not equate to providing an inability-to-pay defense. An element of ability to pay, as part of the criminal charge itself, is not the same as an affirmative defense, whether based on an inability to pay or something else.

[102] The dissent interprets our acknowledgment that a family court considers parents' ability to pay when it sets a support obligation as dispositive evidence that the "obligor is able to pay." *Post* at 27. This inference, and the multiple other inferences that the dissent makes from it, are not supported by a reasonable interpretation of our decision. That a family court considers a parent's ability to pay when setting a support obligation does not mean, as the dissent suggests, that the support order is entered into evidence and rubber-stamped as proof beyond a reasonable doubt that a defendant is guilty of felony nonsupport. Nor does the admission of the support order in the criminal proceedings undercut the presumption of innocence or shift the burden of proof to the defendant. Rather, we have explained in detail that "the full panoply of constitutional protections that inhere in any criminal prosecution" apply to criminal proceedings for nonsupport. *Supra* at 36.

44

notions of fairness and common sense."[103]  In our judgment, it is the dissent's view, not ours, that "offends traditional notions of fairness and common sense."  Requiring parents to provide support for their children and organize their financial affairs in such a way as to be able to do so is wholly consistent with all traditional notions of fairness and common sense of which we are aware, in particular the traditional notions that parents are expected to support their children and make their children's well-being the central priority of their lives.[104]  Although the dissent criticizes our approach and complains that "only the rarest of persons" will be able to demonstrate impossibility,[105] that is *exactly* the point.  We intend that, consistently with MCL 750.165, a parent who fails to pay court-ordered child support must meet an exacting standard to demonstrate a genuine impossibility defense.[106]

---

[103] *Post* at 25.

[104] The dissent accuses the majority of relying "heav[il]y" on public policy, *post* at 25 n 58, but it is the dissent that has injected these policy concerns into the discussion by asserting that our opinion is contrary to traditional notions of fairness and common sense. Our principal analysis is not policy-based, but is based on the plain language of the statute and the fact that there is no indication that the Legislature abrogated the common-law defense of impossibility when it enacted the felony-nonsupport statute.  Clearly, we have tried to articulate what might have been the *Legislature's* rationale for striking the "refuse or neglect" language from the statute, not project what might constitute our own policy preferences.

[105] *Post* at 24.

[106] If any explanation were needed for the Legislature's decision to exercise its undisputed authority to define felony nonsupport as a strict-liability crime and thereby "regulate[] conduct under the state's police power to promote the social good," *Quinn*, 440 Mich at 187, it could be found in a report of a Michigan-based task force formed to address "the need for better enforcement of the laws requiring parents to support their own children . . . ."  Underground Economy Task Force, *The Underground Economy* (June 2010), p 8, available at <http://courts.michigan.gov/scao/resources/publications/

While we have gone to great lengths to articulate the standard a defendant must meet to demonstrate a genuine impossibility defense, the dissent protests and then proceeds to describe a vague inability-to-pay defense that is described in terms that echo our impossibility defense.[107] However, the dissent's inability-to-pay defense lacks both

reports/UETF-2010.pdf> (accessed June 15, 2012). This task force, chaired by former Justice and now Department of Human Services Director MAURA CORRIGAN, documents "the sad truth that far too many parents now refuse to accept th[eir] inherent responsibility to support their children." *Id*. The numbers substantiating this "sad truth" are staggering. Every year, "[f]ederal, state, territorial, and local governments spend $5.9 billion just to enforce parents' inherent obligation to support their children." *Id*. at 11. In 2010, the United States Department of Health and Human Services' Office of Child Support Enforcement reported that in Michigan more than 610,000 child support cases had arrears due and calculated the total arrearage at $9.1 million. See Child Support Enforcement FY 2010 Preliminary Report, <http://www.acf.hhs.gov/programs/cse/pubs/2011/reports/preliminary_report_fy2010.html> (accessed June 15, 2012), Tables P-18 and P-20. Moreover, this total greatly underestimates the true arrearage because it does not take into account how much additional child support parents would owe if they fully and honestly disclosed their finances. See *Underground Economy* at 12.

The Underground Economy Task Force report details the strain this serious social problem places on children and the public, concluding:

> [W]hile the number of willfully neglected children has continued to increase, our governments' ability to help them has declined. Those inversely correlated trends have created intolerable stresses for both children and governments. *We no longer can afford—either financially or socially—to excuse parents who will not support their children*. [*Id*. at 10 (emphasis added).]

These considerations, which are completely ignored by the dissent, make clear that the Legislature's decision to define felony nonsupport as a strict-liability crime was perfectly reasonable and that there is nothing remotely offensive to "traditional notions of fairness and common sense" in the Legislature's decision or in this Court's exacting impossibility defense.

[107] In light of the similarity between our language and that of the dissent, see summary in note 93 of this opinion, it is unclear how the dissent can reasonably assert that our impossibility standard fails to pass constitutional muster. Clearly, the dissent agrees with

the structure and breadth of view that we provide. Apparently, in the dissent's view, the relevant consideration is whether an individual charged with felony nonsupport has any money in his or her pocket on the day he or she is haled into court.[108] However, the dissent's rule would permit parents who deliberately refuse to pay child support to shirk their responsibilities to their children and manipulate the criminal justice system, with the result that taxpaying citizens will bear the responsibility of supporting these children, rather than the parent, who ought to be primarily responsible.[109] The dissent protests that

---

our conclusion that MCL 750.165 imposes strict liability. Yet the dissent asserts that "[a]bility-to-pay determinations made in a civil court cannot constitutionally be used as the basis for establishing that a defendant was able to pay in a criminal case." *Post* at 29. However, ability to pay is not an element in Michigan's nonsupport statute. Further, we have, like the dissent, recognized that a criminal action for felony nonsupport does not disturb the underlying support order that forms the basis of the criminal charge.

[108] We emphasize that the criminal action for felony nonsupport is not an opportunity to revisit the terms of the underlying support order, a point with which the dissent agrees. The amount of child support is determined in the civil proceeding, in which a parent's income and financial resources are considered. A parent who is honest and acts in good faith from the outset, meets his or her support obligation, and, in the instance of changed financial circumstances, timely moves for modification of the support order, is unlikely to be charged with, much less found guilty of, felony nonsupport. Thus, the dissent's concern that the effect of our decision will be to create "debtors' prisons" affecting those *other than* the "willful, recalcitrant, obdurate, or deceitful," *post* at 23, 27, is simply unfounded. In any event, such a case is not before us today, and we need not speculate regarding facts not presented. We have strived to provide guidance for avoiding criminal punishment to parents whose financial circumstances change after their ability to pay has been determined and a support order entered. Thus, the point that seems to have escaped the dissent—that any defense to a charge of felony nonsupport must be assessed on the basis of *some consistent and articulable standard*—was not overlooked by either the legislatures that enacted the statutes the dissent cites or the defense we articulate here today.

[109] The dissent's view would also render meaningless a family court's imputed potential income determination. A child support obligation may be calculated based on imputed income "when a parent is voluntarily unemployed or underemployed, or has an

---

47

under our impossibility standard, a person could be found guilty of felony nonsupport "because, although he or she is unable to pay, it might not have been utterly impossible to pay had he or she known how to manage money better."[110]  Again, this is exactly the point.  We can find nothing unfair about a defense that does not excuse parents from their inherent obligation to support their child simply because they are "unable to pay" child support on a particular day when, over the course of the child's life, they have made irresponsible, selfish financial decisions that reflect a lack of concern for their child's well-being and when, as a result of these decisions, the child is likely to become a public charge.

Unlike the dissent, our view of the question of parental responsibility and obligation leads us to endorse the impossibility defense to a charge of felony nonsupport. Our impossibility defense differs from the dissent's approach because we provide guidance regarding how the defense is to be adjudicated at the circuit court level, and although a parent's ability to pay is one factor that we consider, we also consider other factors.  In sum, the ability-to-pay inquiry is subsumed within the impossibility defense. Our interpretation is consistent with centuries-old common law and with the plain language of MCL 750.165, Michigan's nonsupport statute.

---

unexercised ability to earn." 2008 MCSF 2.01(G).  Once the child support obligation is set, and the parent chooses to continue avoiding comparable employment that he or she is capable of performing (the *very reason* that income was imputed in the first place), the parent can simply claim an "inability to pay" and escape criminal liability.  The dissent's ill-advised scheme would have precisely the effect on children and society that the Legislature sought to prevent by enacting a system of court-ordered *parental* support.

[110] *Post* at 25.

48

## V. CONCLUSION

We conclude that *People v Adams* correctly held that MCL 750.165 imposes strict liability because it does not require a *mens rea*, and that evidence of a defendant's inability to pay, without more, is not a valid defense to a charge of felony nonsupport. However, we hold that a defendant charged with felony nonsupport may, in exceptional circumstances, on making the requisite evidentiary showing, establish impossibility as a defense to a charge of felony nonsupport.

In summary, having concluded that Likine preserved this claim of constitutional error and that the prosecution has not shown that the error was harmless, we reverse her conviction and remand the case to the circuit court for further proceedings. Because we conclude that defendant Parks is not entitled to relief, we affirm the judgment of the Court of Appeals in that case. Lastly, Harris entered an unconditional guilty plea, which affirmatively waived the defense at issue, and he is therefore not entitled to relief.

Mary Beth Kelly
Robert P. Young, Jr.
Stephen J. Markman
Brian K. Zahra

49

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                      No. 141154

SELESA ARROSIEUR LIKINE,

        Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                      No. 141181

MICHAEL JOSEPH PARKS,

        Defendant-Appellant.

_____

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v                                                      No. 141513

SCOTT BENNETT HARRIS,

        Defendant-Appellant.

_____

MARILYN KELLY, J. (*dissenting*).

      The majority advises that its view of parental responsibility and obligations leads it to adopt a new defense to the charge of felony nonsupport, the defense of impossibility

1

to pay. I share the majority's view of the responsibilities and obligations of parents. But there is an important difference between us. It lies in our respective interpretations of what defense MCL 750.165 allows a parent facing imprisonment for failing to pay child or spousal support. For reasons I will describe, I believe that the interests of children, as well as of all other members of society, are best served by providing a more traditional defense. I propose the almost universally accepted defense of inability to pay.

At their essence, these cases are about the basic judicial task of ensuring that government functions within the scope of our state and federal constitutions. Our sister states have been conscientious in undertaking this task. Forty-nine of them and the District of Columbia provide the defense of inability to pay or consider a defendant's ability to pay as an element of the crime of felony nonsupport. Conventional wisdom suggests that the Michigan Supreme Court should adopt the same defense when it considers the question for the first time. It has not done so.

Instead, the majority rejects the national norm and bucks the trend. It concludes that inability to pay does not constitute a defense to felony nonsupport. The defendant must demonstrate impossibility to pay. Moreover, notwithstanding the majority's protestations to the contrary, the inability-to-pay defense is not subsumed within this defense of impossibility to pay. The majority will indeed consider inability to pay. But should any fault whatsoever be shown on the part of the accused, the majority's impossibility-to-pay defense will entirely disregard the strongest evidence of inability to pay. I believe that this standard, at once unique and manifestly harsh, will prove counterproductive. I also believe it is unconstitutional.

Like the majority, I wish to be faithful to the intent of the Legislature in interpreting MCL 750.165. In doing so, I am deeply concerned that we will reinstitute the wisely long-abandoned institution of debtor's prisons. The majority appears to lack this concern.

Furthermore, the majority's "analysis" supporting its impossibility-to-pay defense is flawed from the first page. In crafting it, the majority repeatedly bows to what it declares is the Legislature's expressed intent. But no expressed justification for the majority's position is to be found anywhere in any statute. For all of these reasons, I respectfully dissent.

## I. ANALYSIS

## A. LEGAL BACKGROUND

These cases involve the failure of three defendants to satisfy court-ordered child support obligations. MCL 750.165 criminalizes such conduct.[1] It provides, in relevant part:

> (1) If the court orders an individual to pay support for the individual's former or current spouse, or for a child of the individual, and the individual does not pay the support in the amount or at the time stated in the order, the individual is guilty of a felony punishable by imprisonment for not more than 4 years or by a fine of not more than $2,000.00, or both.

---

[1] I find it noteworthy that those responsible for publishing Michigan's statutes found it appropriate to caption this provision in terms of penalizing a *refusal* to pay. See 2 Public & Local Acts of Michigan (2004 Session), 2004 PA 570, p 2259 ("Refusing to support wife or children"); see also MCLA 750.165 ("Refusal to pay support for former or current spouse") and MCLS 750.165 ("Refusing to support wife or children").

3

(2) This section does not apply unless the individual ordered to pay support appeared in, or received notice by personal service of, the action in which the support order was issued.

* * *

(4) The court may suspend the sentence of an individual convicted under this section if the individual files with the court a bond in the amount and with the sureties the court requires. At a minimum, the bond must be conditioned on the individual's compliance with the support order. If the court suspends a sentence under this subsection and the individual does not comply with the support order or another condition on the bond, the court may order the individual to appear and show cause why the court should not impose the sentence and enforce the bond. After the hearing, the court may enforce the bond or impose the sentence, or both, or may permit the filing of a new bond and again suspend the sentence.

Although I agree with the majority that MCL 750.165 sets forth a strict liability offense, persons accused of felony nonsupport still have the constitutionally guaranteed right, both state and federal, to present a defense.[2] As the United States Supreme Court has recognized, this guarantee rests on a bedrock constitutional principle: "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."[3] However, the majority severely narrows an accused's constitutionally protected "complete defense" to charges of felony nonsupport. It requires a showing of impossibility to pay. It is this conclusion to which I take exception.

---

[2] See US Const, Ams VI and XIV; Const 1963, art 1, §§ 13, 17, and 20.

[3] *California v Trombetta*, 467 US 479, 485; 104 S Ct 2528; 81 L Ed 2d 413 (1984).

4

Thirty-five years ago in *People v Ditton*,[4] the Court of Appeals considered an earlier version of MCL 750.165.[5]  The defendant argued that his inability to pay barred his prosecution under the statute.  He further argued that the trial court had erred by failing to instruct the jury that it must first find that he was able to pay the support ordered.  Only then could it find that he had neglected to pay it.  The Court of Appeals agreed.  It concluded that MCL 750.165 did not expressly provide for the defense of inability to pay, but "[o]ther Michigan criminal nonsupport statutes [made] it necessary to show defendant's ability to pay" as a precursor to obtaining a conviction.[6]

---

[4] *People v Ditton*, 78 Mich App 610; 261 NW2d 182 (1977).

[5] When *Ditton* was decided, MCL 750.165 provided:

> Where in any decree of divorce, or decree of separate maintenance granted in this state, or by order entered during the pendency of any such proceedings, if personal service is had upon the husband or upon the father of any minor child or children, under the age of 17 years, or such husband or father shall have entered an appearance in such proceedings either as plaintiff or defendant, the court shall order such husband to pay any amount to the clerk or friend of the court for the support of any wife or former wife who by reason of any physical or mental affliction is unable to support herself, or father to pay any amount to the clerk or friend of the court for the support of such minor child or children, and said husband or father shall refuse or neglect to pay such amount at the time stated in such order and shall leave the state of Michigan, said husband or father shall be guilty of a felony: Provided, however, If at any time before sentence he shall enter into bond to the people of the state of Michigan, in such penal sum and with such surety or sureties as the court may fix, conditioned that he will comply with the terms of such order or decree, then the court may suspend sentence therein: Provided further, That upon failure of such person to comply with said undertaking he may be ordered to appear before the court and show cause why sentence should not be imposed, whereupon the court may pass sentence, or for good cause shown may modify the order and take a new undertaking and further suspend sentence as may be just and proper.

[6] *Ditton*, 78 Mich App at 614-615.

5

The Court also noted that in contempt proceedings, a party charged with paying child support must be allowed to explain why the support order had not been obeyed and that only "'the wilful, the recalcitrant, the obdurate or deceitful' . . . are not excused from their legal obligations."[7] Therefore, the Court concluded, the trial court erred when it ruled that the defendant's ability to pay was irrelevant.[8]

The version of MCL 750.165 now in effect was enacted in 1999[9] and is similar to the earlier version. The current version still criminalizes failure to comply with support obligations and specifically indicates the maximum penalty for violations of the statute. The legislative history indicates that the purpose of the revisions was to enact gender-neutral language and provide courts with authority to suspend a sentence under certain circumstances. The Senate Fiscal Agency's analysis stated that the revisions

> would delete and reenact, with gender-neutral language, a provision of the Penal Code making refusal to pay a support order a felony. Under the bill, it would be a felony, punishable by up to four years' imprisonment, a maximum fine of $2,000, or both, for a person subject to a court order for spousal or child support, to fail to pay the support in the amount or at the time stated in the order. The felony provision would not apply unless the person ordered to pay support appeared in the action in which the support order was issued, or received notice of that action by personal service. (The proposed penalty is the same as that established in the law for a felony for which a penalty is not otherwise specified.)

> The court could suspend the sentence of a person convicted under the bill if he or she filed with the court a bond in the amount and with the sureties the court required. At a minimum, the bond would have to be

---

[7] *Id*. at 617, quoting *Reed v Reed*, 53 Mich App 625, 627; 220 NW2d 199 (1974).

[8] *Id*. at 617.

[9] See 1999 PA 152.

conditioned on the person's compliance with the support order. If the person did not comply with the support order or another condition of the bond, the court could order the person to appear and show cause why the court should not impose the sentence and enforce the bond. After the hearing, the court could enforce the bond and/or impose the sentence, or could permit the filing of a new bond and again suspend the sentence.[10]

When the Legislature enacted the current version of MCL 750.165, *Ditton* had permitted defendants to raise an inability-to-pay defense to felony nonsupport charges for the preceding 22 years. Yet that defense was not addressed by 1999 PA 152.[11] The Legislature is presumed to know the law, including decisions of our courts.[12] Its acquiescence to *Ditton* is consistent with the intent to continue to allow an accused to raise an inability-to-pay defense.[13]

---

[10] Senate Bill Analysis, HB 4826, October 12, 1999, p 1.

[11] The majority claims that I miss the point that "any defense to a charge of felony nonsupport must be assessed on the basis of some . . . articulable standard[, which] was not overlooked by . . . the legislatures that enacted the statutes [I] cite[] . . . ." *Ante* at 47 n 108 (emphasis omitted). It is unclear whether the majority is referring to (1) my citation of every other state's consideration of a defendant's inability to pay in note 52 of this opinion or (2) the current and former versions of Michigan's statute. If the majority is referring to every other state's consideration of inability to pay, then it must acknowledge that those states have decided that inability to pay *is* a consistent and articulable standard. If the majority is referring to the current and former versions of Michigan's nonsupport statutes, then its claim is simply inaccurate. Neither the current nor the former version of MCL 750.165 has ever expressly provided a defense to a charge of felony nonsupport.

[12] *Ford Motor Co v City of Woodhaven*, 475 Mich 425, 439-440; 716 NW2d 247 (2006).

[13] The majority observes that it holds the doctrine of legislative acquiescence in disfavor. Yet it cannot deny that the Legislature made no effort to alter *Ditton*'s holding for 22 years. Moreover, the doctrine of legislative acquiescence has established roots in both United States Supreme Court and Michigan jurisprudence. See, e.g., *Shepard v United States*, 544 US 13, 23; 125 S Ct 1254; 161 L Ed 2d 205 (2005); *Craig v Larson*, 432 Mich 346, 353; 439 NW2d 899 (1989); *Wikman v City of Novi*, 413 Mich 617, 638; 322 NW2d 103 (1982); *In re Clayton Estate*, 343 Mich 101, 106-107; 72 NW2d 1 (1955).

Notwithstanding that fact, in *People v Adams*,[14] the Court of Appeals strayed from *Ditton* and held that the 1999 amendments of MCL 750.165 affirmatively precluded a defendant from raising an inability-to-pay defense. *Adams* opined that the revised statute does not allow that defense because felony nonsupport is a strict liability offense.[15] It further reasoned that the defense would be inconsistent with the provision of MCL 750.165 that authorizes suspension of a sentence if the defendant files a bond conditioned on compliance.[16]

*Adams* held that defendants are effectively precluded from raising a defense of any kind to felony-nonsupport charges. I believe it was wrongly decided and should be explicitly overruled. It is unclear what the majority holds with respect to *Adams*. When it holds that defendants may present an impossibility-to-pay defense, it suggests that

The majority cannot deprive the minority of the tools with which judges typically and traditionally engage in statutory interpretation. Its preferred interpretive methods do not bind other members of the Court. See *People v Williams*, 491 Mich 164, 194 n 31; 814 NW2d 270 (2012) (MARILYN KELLY, J., dissenting).

[14] *People v Adams*, 262 Mich App 89; 683 NW2d 729 (2004).

[15] *Id*. at 100.

[16] *Id*. at 97, citing MCL 750.165(3), now MCL 750.165(4). See 2004 PA 570. The majority posits that my analysis would return the law to its state before the Legislature enacted 1999 PA 152, "contrary to the Legislature's clear intent." *Ante* at 40. This statement masks the fact that no statutory evidence exists that the Legislature intended to remove the inability-to-pay defense that *Ditton* recognized. Nor is there language in MCL 750.165 or in any other statute that supports the majority's impossibility-to-pay defense. By sleight of pen, the majority parlays its reading of MCL 750.165 and of the Legislature's intent into support for an impossibility-to-pay defense. Thus, contrary to the majority's claim otherwise, there can be no analysis "based on the plain language of the statute," *ante* at 45 n 104, because MCL 750.165 provides no defense to a charge of felony nonsupport.

8

*Adams* was wrongly decided. But it agrees with *Adams*'s holding that, if an individual does not pay court-ordered support, he or she is automatically guilty of a felony under MCL 750.165. *Adams* should be unequivocally overruled.[17]

## B. THE MAJORITY'S IMPOSSIBILITY-TO-PAY DEFENSE

I find the impossibility-to-pay defense adopted by the majority problematic for several reasons. First, the term "impossibility" has a distinct meaning in criminal law. Courts have distinguished two categories of impossibility in attempt crimes: factual and legal. Factual impossibility exists when a defendant intended to perpetrate a certain crime but failed to commit it because of factual circumstances that were unknown or beyond his or her control.[18]

Legal impossibility can be broken down into two subcategories: pure legal impossibility and hybrid legal impossibility. Pure legal impossibility exists when an

---

[17] Rather than limit its discussion to the merits, the majority claims that my analysis of the Legislature's acquiescence to *Ditton* is merely my "policy preference." *Ante* at 40 n 96. It argues that, after the Court of Appeals' opinion in *Adams*, the doctrine of legislative acquiescence could also lead one to conclude that the Legislature intended to eliminate inability to pay as a defense. This is incorrect. *Adams* effectively precluded all defenses to nonsupport charges, including the impossibility-to-pay defense now sanctioned by the majority, and it is thus unconstitutional. It cannot be assumed that the Legislature agreed with an unconstitutional decision. The doctrine of legislative acquiescence does not fit with the *Adams* decision.

[18] *People v Thousand*, 465 Mich 149, 158; 631 NW2d 694 (2001) (citation omitted). For example, a factual impossibility occurs when a pickpocket picks an empty pocket. See Black's Law Dictionary (9th ed), p 824. This type of impossibility has never been recognized as a defense to a charge of attempt.

9

actor engages in conduct that he or she believes is prohibited by law, but it is not.[19]

Hybrid legal impossibility exists when a defendant's goal is to commit an illegal act, but it is impossible to do so because of a *factual* mistake regarding the *legal* status of some factor relevant to the intended conduct.[20] "'This version of impossibility is a "hybrid" because, as the definition implies . . . , [the defendant's] impossibility claim includes both a legal and a factual aspect . . . .'"[21]

The cases involved here are not attempt crimes. Moreover, neither factual nor legal impossibility is involved. I discuss the terms merely to show that their use has a nuanced meaning in criminal law. They could easily be confused with the majority's newly minted "impossibility-to-pay" defense in the context of felony nonsupport charges.[22]

A second problem with the majority's analysis is that it is at best marginally supported by one Michigan case decided 123 years ago—*Port Huron v Jenkinson*.[23]

---

[19] *Thousand*, 465 Mich at 158-159. For example, a pure legal impossibility occurs when "a person goes hunting while erroneously believing that it is not hunting season." Black's Law Dictionary (9th ed), p 824.

[20] *Thousand*, 465 Mich at 159. For example, a hybrid legal impossibility exists when an individual attempts to bribe a juror, but chooses someone to bribe who is not on the jury.

[21] *Id*., quoting Dressler, Understanding Criminal Law (1st ed), § 27.07[B], p 349.

[22] The majority criticizes my discussion of factual and legal impossibility in which I observe that those defenses apply only to crimes of attempt. In doing so, the majority underscores my point: its newly fashioned impossibility-to-pay defense to a charge of felony nonsupport could be confused with the impossibility defenses that have historically applied in a distinctly different setting.

[23] *Port Huron v Jenkinson*, 77 Mich 414; 43 NW 923 (1889).

*Jenkinson* dealt with a city ordinance that criminalized a property owner's failure to repair a sidewalk adjacent to his property. The Court opined that "[n]o legislative or municipal body has the power to impose the duty of performing an act upon any person which it is impossible for him to perform, and then make his non-performance of such a duty a crime . . . ."[24] Thus, the Court recognized that the defendant could successfully defend himself by arguing that it was impossible to comply with the ordinance. However, the Court also stated that

> [i]t will readily be seen that a tenant occupying a house and lot in the city of Port Huron, *and so poor and indigent as to receive support from his charitable neighbors*, if required by the city authorities to build or repair a sidewalk along the street in front of the premises he occupies, and fails to comply with such request, such omission becomes criminal; and, upon conviction of the offense, he may be fined and imprisoned. It is hardly necessary to say these two sections of the statute are unconstitutional and void, and that the provisions are of no force or effect.[25]

Thus, *Jenkinson* recognized that when a defendant is "so poor and indigent" as to be unable to comply with the ordinance, he or she may not be criminally punished. Accordingly, even though *Jenkinson* used the word "impossible" once, it implicitly considered the defendant's inability to pay.

It is apparent that the majority overstates *Jenkinson*'s use of "impossible." *Jenkinson* intended a much broader use of the word, one akin to inability to pay. If it had been shown that the defendant in *Jenkinson* could have used the "support from his

---

[24] *Id*. at 419.

[25] *Id*. at 420 (emphasis added).

11

charitable neighbors"[26] to build a sidewalk, he would not have satisfied an impossibility defense. He could not have demonstrated that it was impossible for him to pay. But the *Jenkinson* Court held the ordinance unconstitutional *notwithstanding* the defendant's failure to apply this charitable support toward his sidewalk construction obligation. Therefore, the majority's impossibility-to-pay standard fails the constitutional test established by *Jenkinson*. If the defendant in that case could not have satisfied the majority's impossibility-to-pay defense, then that defense is unconstitutional.[27]

Third, the majority ignores our Court of Appeals' decision in *Ditton*. *Ditton* held that inability to pay is a defense that must be considered for MCL 750.165 to pass

---

[26] *Id*.

[27] Similarly, the majority's reliance on ancient decisions of English courts in support of its impossibility-to-pay defense is of questionable value. First, those decisions were rendered centuries ago in courts having no authority over this Court. Second, they are easily distinguishable from the case before us because they dealt with impossibility in the truest sense of the word. See *Stockdale v Coulson*, 3 All ER 154 (1974) (failing to attach documents that never existed), and *Regina v Bamber*, 5 QB 279, 287; 114 ER 1254 (1843) (comment by Lord Denman, C.J.) (failing to build a road where there was no land). *Regina v Hogan*, 169 ER 504; 2 Den 277 (1851), is also inapposite. That case considered a mother criminally charged with abandonment after momentarily leaving her child in order to procure food for him. Closer scrutiny of *Hogan*'s holding reveals that the defense it sanctioned is more appropriately characterized as inability to pay than impossibility to pay. The court specifically noted that there was not an extensive inquiry into whether the mother had the *means* of supporting the child—not whether it was impossible for her to have supported him. Indeed, that opinion does not contain the word "impossible." In sum, none of these archaic cases furnishes a precedential basis for the majority's narrow impossibility-to-pay defense.

12

constitutional muster.[28]   The majority fails to explain why *Ditton* would not render its impossibility-to-pay defense unconstitutional.

## C.  THE INABILITY-TO-PAY DEFENSE

## 1.  MICHIGAN

The proper defense to felony nonsupport charges, as set forth in *Ditton*, consists of proving that a defendant is unable to pay the court-ordered support.[29]   Ability-to-pay determinations are commonplace in the legal system.   For example, in *People v Jackson*,[30] we considered whether a trial court may require a defendant to pay for a court-appointed attorney pursuant to MCL 769.1k without first determining the defendant's ability to pay.  We unanimously held that notwithstanding the lack of statutory language providing for an assessment of a defendant's ability to pay, that determination must be

---

[28] *Ditton*, 78 Mich App at 617 (finding "no meaningful distinction between [MCL 750.165] and the statute found unconstitutional in Kentucky" for lacking an inability-to-pay defense).

[29] The majority earnestly insists that this defense would "permit parents who deliberately refuse to pay child support to shirk their responsibilities to their children and manipulate the criminal justice system . . . ." *Ante* at 47.  This is utterly untrue.  As in every other jurisdiction that considers a defendant's inability to pay, trial courts would weigh the evidence, if any, to determine whether the defendant is able to pay.  If the trier of fact determined that the defendant was able to pay, the defense would not apply.  It would not enable a defendant to shirk his or her support obligation or otherwise manipulate the criminal justice system.  I fully agree with the majority that support obligors must be held responsible for satisfying their obligations.  This belief, however, does not undermine the legitimacy of the inability-to-pay defense or justify the majority's overly restrictive standard.  In every other state, those with support obligations are not able to refuse to pay, shirk their responsibilities, or manipulate the criminal justice system simply by raising an inability-to-pay defense.

[30] *People v Jackson*, 483 Mich 271; 769 NW2d 630 (2009).

made when payment is required.[31]  We further held that "once an ability-to-pay assessment is triggered, the court must consider whether the defendant remains indigent and whether repayment would cause manifest hardship."[32]

Ability-to-pay assessments are also relevant in the context of criminal restitution payments.  In *People v Music*,[33] this Court considered whether, in imposing restitution or costs as a part of sentence or probation, a defendant's ability to pay must be considered. The Court again unanimously held that if a defendant asserts the inability to pay restitution or costs, the court must inquire into the defendant's ability or lack of it.[34]

Not only does caselaw suggest that a defendant's ability to pay must be considered when determining criminality or applying a penalty, but so do several statutes.  MCL 750.161 criminalizes desertion or nonsupport of a spouse or children.  It provides, in pertinent part:

> A person who deserts and abandons his or her spouse or deserts and abandons his or her children under 17 years of age, without providing necessary and proper shelter, food, care, and clothing for them, and a person who *being of sufficient ability* fails, neglects, or refuses to provide necessary and proper shelter, food, care, and clothing for his or her spouse or his or her children under 17 years of age, is guilty of a felony . . . .[35]

---

[31] *Id*. at 275.

[32] *Id*.

[33] *People v Music*, 428 Mich 356; 408 NW2d 795 (1987).

[34] *Id*. at 363.

[35] MCL 750.161(1) (emphasis added).

14

Thus, a conviction under MCL 750.161 presupposes that the defendant has the ability to pay for proper shelter, food, care, and clothing for family members.

Similarly, MCL 750.168 provides that a person convicted of being "a disorderly person" is subject to varying degrees of punishment. MCL 750.167(1)(a) defines "disorderly person" as "[a] person of *sufficient ability* who refuses or neglects to support his or her family."[36] This provision further reflects the Legislature's recognition that a defendant's ability to pay must be considered before imposing criminal punishment.

Ability-to-pay determinations also serve as the underpinning of spousal support awards, which, when violated, form the bases of criminal nonsupport charges. MCL 552.23(1) provides that in divorce and actions for separate maintenance, the court may also award spousal support "after considering the *ability* of either party to pay . . . ."[37] This principle has been extended to child support awards.[38]

## 2. THE UNITED STATES SUPREME COURT

The United States Supreme Court has also recognized that statutes that punish persons for nonpayment of debts without permitting them to present evidence of their inability to pay are repugnant to the Constitution. In *Zablocki v Redhail*,[39] the Court struck down as unconstitutional a Wisconsin statute that prohibited men with outstanding child support obligations from marrying without first obtaining a court order granting

---

[36] Emphasis added.

[37] Emphasis added.

[38] See, e.g., *Beverly v Beverly*, 112 Mich App 657, 661; 317 NW2d 213 (1981).

[39] *Zablocki v Redhail*, 434 US 374; 98 S Ct 673; 54 L Ed 2d 618 (1978).

15

permission. The plaintiff in that case could not obtain the requisite court order because he lacked the financial resources to meet his support obligations. The Court struck down the statute on both due process and equal protection grounds. Justice Stewart, concurring, noted that the "law makes no allowance for the truly indigent" and that "[t]o deny these people permission to marry penalizes them for failing to do that which they cannot do. Insofar as it applies to indigents, the state law is an irrational means of achieving these objectives of the State."[40]

Concurring in the Court's judgment, Justice Powell distinguished between "persons who are able to make the required support payments but simply wish to shirk their moral and legal obligation" and those "without the means to comply with child-support obligations."[41] He opined that "[t]he vice inheres, not in the collection concept, but in the failure to make provision for those without the means to comply with child-support obligations."[42] Thus, he agreed with his colleagues that the Wisconsin statute was unconstitutional because it failed to provide for those unable, rather than merely unwilling, to pay the child support owed.[43]

Likewise, in *Bearden v Georgia*,[44] the United States Supreme Court considered whether the Fourteenth Amendment prohibits a state from revoking an indigent

---

[40] *Id*. at 394 (Stewart, J., concurring).

[41] *Id*. at 400 (Powell, J., concurring).

[42] *Id*.

[43] *Id*. at 400-401, 403.

[44] *Bearden v Georgia*, 461 US 660; 103 S Ct 2064; 76 L Ed 2d 221 (1983).

defendant's probation for failure to pay a fine and restitution. The Court held that "the trial court erred in automatically revoking probation because petitioner could not pay his fine, without determining that petitioner had not made sufficient bona fide efforts to pay or that adequate alternative forms of punishment did not exist."[45] The Court opined that to revoke probation when the petitioner, through no fault his own, could not pay the fine violated due process because it was "contrary to the fundamental fairness required by the Fourteenth Amendment."[46] The Court approvingly cited Justice Powell's *Zablocki* concurrence, which emphasized the distinction between "persons who shirk their moral and legal obligation to pay . . . from those wholly *unable* to pay."[47]

---

[45] *Id*. at 661-662.

[46] *Id*. at 672-673.

[47] *Id*. at 669, citing *Zablocki*, 434 US at 400 (Powell, J., concurring) (emphasis added). The majority cites *Bearden* in support of its impossibility-to-pay defense. But nowhere in *Bearden* does the word "impossible" appear, nor any derivation of it. Indeed, the majority opinion is internally inconsistent, as it relies on *Bearden*'s "sufficient bona fide efforts" standard for guidance in one place, but elsewhere suggests that "'sufficient bona fide efforts . . .' [to repay a support obligation] . . . standing alone will not necessarily establish an impossibility defense . . . ." Compare *ante* at 29 with *ante* at 30-31. Furthermore, this Court cited *Bearden* in support of its implementation of an ability-to-pay analysis in *Jackson*. See *Jackson*, 483 Mich at 279-280. In any event, when the principles from *Bearden* are applied, an inability-to-pay defense would not "permit parents who deliberately refuse to pay child support to shirk their responsibilities to their children and manipulate the criminal justice system . . . ." *Ante* at 47. This is because an inability-to-pay defense would not provide relief to a parent who "willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay . . . ." *Bearden*, 461 US at 672.

17

### 3. APPLICATION OF THE INABILITY-TO-PAY DEFENSE

In light of the aforementioned Michigan caselaw, Michigan statutes, and United States Supreme Court precedent, I would hold that inability to pay is the proper defense to a felony nonsupport charge. To use this defense, a defendant would have to show that he or she has made all reasonable and good-faith efforts to comply with the support order, but could not.[48] In considering a defendant's inability to pay, courts should carefully examine the defendant's financial situation and determine whether the defendant has made sufficient bona fide efforts to comply.[49] However, courts must distinguish between those who willfully shirk their moral and legal obligation to pay and those who are simply unable to do so.[50] As our Court of Appeals explained in *Ditton*:

> "A [parent] who can but will not take care of his [or her] child ought not be coddled by the law. But oppression ought not be practiced in the name of law and justice. . . .
>
> "The accused delinquent parent may have been ever so willing and anxious to perform his [or her] natural duty and to comply with the terms of the civil judgment but was wholly unable to do so."[51]

---

[48] I agree with the majority that the willful, recalcitrant, obdurate, or deceitful should not escape felony nonsupport charges.

[49] See *Bearden*, 461 US at 662. I believe the United States Supreme Court wisely cast the consideration of a defendant's inability to pay in broad terms in recognition of the fact that the determination will generally require a fact-specific inquiry.

[50] See *Zablocki*, 434 US at 400 (Powell, J., concurring).

[51] *Ditton*, 78 Mich App at 616, quoting *Commonwealth v O'Harrah*, 262 SW2d 385, 388 (Ky, 1953).

To be clear, I share the majority's concern that recalcitrant parents must be held accountable. Accordingly, the inability-to-pay defense, like the impossibility-to-pay defense set forth by the majority, would not apply to parents who can but choose not to take care of their children. A willful failure to pay is not an excuse for noncompliance with a support order.

## D. THE MAJORITY'S IMPOSSIBILITY-TO-PAY DEFENSE LACKS SUPPORT

With today's groundbreaking opinion, Michigan becomes the only state that does not allow a defendant's inability to pay to constitute a complete defense to a felony nonsupport charge.[52] The majority has created an exceedingly limited defense to felony

---

[52] See Ala Code 13-A-13-4 ("A man or woman commits the crime of nonsupport if he or she intentionally fails to provide support which that person is *able* to provide and which that person knows he or she is legally obligated to provide to a dependent spouse or child less than 19 years of age."); Alas Stat 11.51.120(a) and (f)(3) ("A person commits the crime of criminal nonsupport if, being a person legally charged with the support of a child the person knowingly fails, without lawful excuse, to provide support for the child. . . . [W]ithout lawful excuse' means having the financial *ability* to provide support . . . ."); Ariz Rev Stat Ann 25-511B ("It is an affirmative defense to a charge of [failure to provide for a child] that the defendant . . . was *unable* to furnish reasonable support."); *Nelke v State*, 19 Ark App 292, 294; 720 SW2d 719 (1986) ("In order to make out the offense [of failure to support a wife or child], the State must show a willful or negligent failure to provide, not a mere failure because of *inability*."); Cal Penal Code 270 ("The court, in determining the *ability* of the parent to support his or her child, shall consider all income, including social insurance benefits and gifts."); Colo Rev Stat 14-6-101 ("It shall be an affirmative defense . . . to a prosecution [for felony nonsupport] that owing to physical incapacity or other good cause the defendant is *unable* to furnish the support, care, and maintenance required by this section."); Conn Gen Stat 53-304(a) ("Any person who neglects or refuses to furnish . . . support to [a spouse or child] . . . shall be deemed guilty of nonsupport . . . unless . . . the person is *unable* to furnish such support."); Del Code Ann tit 11, § 1113(d) ("In any prosecution for criminal nonsupport or aggravated criminal nonsupport, it is an affirmative defense that the accused was *unable* to pay or provide support . . . ."); DC Code 46-225.02(d) ("[F]ailure to pay child support, as ordered, shall constitute prima facie evidence of a willful violation. This presumption may be rebutted if the obligor was incarcerated, hospitalized, or had a

19

disability during the period of nonsupport."); Fla Stat 827.06(2) ("Any person who willfully fails to provide support which he or she has the *ability* to provide to a child or a spouse whom the person knows he or she is legally obligated to support commits a misdemeanor of the first degree . . . ."); *Elam v State*, 138 Ga App 432, 432; 226 SE2d 290 (1976) ("[In convicting the defendant of] wilfully and voluntarily abandoning his minor children . . . the trial court erroneously ruled out some of defendant's evidence as to his financial condition which tended to negate the element of willfulness . . . ."); Hawaii Rev Stat 709-903 ("A person commits the offense of persistent nonsupport if the person knowingly and persistently fails to provide support which the person *can* provide and which the person knows the person is legally obliged to provide to a spouse, child, or other dependent."); *State v Shaw*, 96 Idaho 897, 900; 539 P2d 250 (1975) ("[W]hether the state . . . has overcome by proof beyond a reasonable doubt his *ability* to provide or support and the wilful nature of his non-support or omission, are all factual issues for resolution by the jury."); 750 Ill Comp Stat 16/15(a)(1) ("A person commits the offense of failure to support when he or she . . . willfully, without any lawful excuse, refuses to provide for the support or maintenance of his or her spouse . . . or . . . his or her child or children . . . and the person has the *ability* to provide the support."); Ind Code 35-46-1-5(d) ("It is a defense [to charges of nonsupport of a dependent child] that the accused person was *unable* to provide support."); Iowa Code 726.5 ("A person, who being *able* to do so, fails or refuses to provide support for the person's child or ward under the age of eighteen years for a period longer than one year or in an amount greater than five thousand dollars commits [felony] nonsupport."); *State v Krumroy*, 22 Kan App 2d 794, 800; 923 P2d 1044 (1996) ("[The defendant] would be guilty of failing to provide support without lawful excuse if a jury concluded that he had the *ability* to earn a livelihood and did not do all that he could or should have done under the circumstances."); *Rogers v Commonwealth*, 321 SW2d 779, 781 (Ky, 1959) ("Physical disability and financial *inability* have been recognized as defenses to a prosecution under the child desertion statute."); La Rev Stat Ann 14:74B(1) ("Physical *incapacity* which prevents a person from seeking any type of employment constitutes a defense to the charge of criminal neglect of family."); Me Rev Stat tit 17-A, § 552 ("A person is guilty of nonsupport . . . if he knowingly fails to provide support which he is *able* by means of property or capacity for labor to provide and which he knows he is legally obliged to provide to a spouse, child or other person . . . ."); Md Code Ann, Fam Law 10-203(a) ("A parent may not *willfully* fail to provide for the support of his or her minor child."); Mass Gen Laws ch 273, § 1(4) (A spouse or parent shall be guilty of a felony if he or she "wilfully and while having the financial *ability* or earning capacity to have complied, he fails to comply with an order or judgment for support which has been entered . . . ."); Minn Stat 609.375(8) ("It is an affirmative defense to criminal liability [for nonsupport of spouse or child] if the defendant proves by a preponderance of the evidence that the omission and failure to provide care and support were with *lawful excuse*."); Miss Code Ann 97-5-3 ("Any parent who shall desert or *willfully* neglect or refuse to provide for the support and

maintenance of his or her child or children . . . shall be guilty of a felony . . ..”); *State v Akers*, 287 SW2d 370, 372 (Mo Ct App, 1956) (“If through no action of his own he lacked the *ability* to support them, [the defendant’s] failure to do so was not without good cause and the evidence is insufficient to sustain the conviction.”); Mont Code Ann 45-5-621(1) (“A person commits the offense of nonsupport if the person fails to provide support that the person *can* provide and that the person knows the person is legally obliged to provide to a spouse, child, or other dependent.”); *State v Bright*, 238 Neb 348, 352; 470 NW2d 181 (1991) (“The determination of whether a defendant has the *ability* to pay child support in order to determine whether the failure to do so was intentional is a question of fact left to the jury.”); *Epp v State*, 107 Nev 510, 513-514; 814 P2d 1011 (1991) (“[T]he State could establish willfulness by showing that [the defendant] . . . had the *ability* to generate income . . . .  Obviously, the law does not contemplate punishing a person for failing to do a thing which he *cannot* do.”) (quotation marks and citation omitted); NH Rev Stat Ann 639:4 (“A person is guilty of non-support if such person knowingly fails to provide support which such person is legally obliged to provide and which such person *can* provide to a spouse, child or other dependent.”); NJ Stat Ann 2C:24-5 (“A person commits a crime . . . if he willfully fails to provide support which he *can* provide and which he knows he is legally obliged to provide to a spouse, child or other dependent.”); NM Stat 30-6-2 (“Abandonment of dependent consists of a person having the *ability* and means to provide for his spouse or minor child’s support and abandoning or failing to provide for the support of such dependent.”); NY Penal Law 260.05(2) (A person is guilty of nonsupport of a child when “he or she knowingly fails or refuses without lawful excuse to provide support for such child when he or she is *able* to do so . . . .”); *State v McMillan*, 10 NC App 734, 735-736; 180 SE2d 35 (1971) (“‘In a prosecution [for failure to support a child,] the failure by a defendant to provide adequate support . . . must be wilful, that is, he intentionally and without just cause or excuse does not provide adequate support for his child according to his means and station in life . . . .’”) (citation omitted); ND Cent Code 12.1-37-01(4) (“It is an affirmative defense to a charge [of failure to support a child] that the defendant suffered from a disability during the periods an unpaid child support obligation accrued . . . .”); Ohio Rev Code Ann 2919.21(D) (“It is an affirmative defense to a charge of failure to provide adequate support . . . that the accused was *unable* to provide adequate support or the established support but did provide the support that was within the accused’s *ability* and means.”); Okla Stat tit 21, § 852(A) (“[A]ny parent, guardian, or person having custody or control of a child . . . who willfully omits, *without lawful excuse*, to furnish . . . child support . . . is guilty of a misdemeanor . . . .”); *State v Timmons*, 75 Or App 678, 681; 706 P2d 1018 (1985) (“It is commonly understood that a ‘lawful excuse’ [for failure to pay support] refers to some condition, not of the defendant’s own making, which prevents the defendant from being *able* to provide support.”); 23 Pa Cons Stat 4354(a) (“An individual who willfully fails to comply with a support order of a court of this Commonwealth when the individual has the financial *ability* to comply with the support order commits an

21

nonsupport charges not recognized by any legislature or any other court in the country.[53]

Not a *single* state recognizes impossibility as the proper defense to felony nonsupport

offense."); RI Gen Laws 11-2-1.1(a) ("Every person who is obligated to pay child support . . . and who shall *willfully* thereafter, having the *means* to do so, fail to pay . . . shall be guilty of a felony . . . ."); SC Code Ann 63-5-20(A) ("Any *able*-bodied person *capable* of earning a livelihood who shall, without just cause or excuse, abandon or fail to provide reasonable support to his or her spouse or to his or her . . . child dependent upon him or her shall be deemed guilty of a misdemeanor . . . ."); SD Codified Laws 25-7-16 ("A parent of a minor child who intentionally omits *without lawful excuse* to furnish . . . [child support] is guilty of a . . . misdemeanor."); Tenn Code Ann 39-15-101(a) ("A person commits the crime of nonsupport who fails to provide support which that person is *able* to provide and knows the person has a duty to provide to a minor child or to a child or spouse . . . ."); Tex Penal Code Ann 25.05(d) ("It is an affirmative defense to prosecution [for criminal nonsupport] that the actor *could not* provide support for the actor's child."); Utah Code Ann 76-7-201(5)(a) ("[I]t is an affirmative defense [to criminal nonsupport charges] that the accused is *unable* to provide support."); *State v Thibedeau*, 95 Vt 164; 113 A 873 (1921) ("Where, as here, the charge is a willful neglect to support, the pecuniary *ability* of the respondent [to pay] is material."); *Painter v Commonwealth*, 140 Va 459; 124 SE 431, 432 (1924) ("That the absolute *inability* of the accused to contribute anything to the support of his family should be held to bar the prosecution, at least temporarily, is apparent from a consideration of the act in its entirety, and its avowed purpose."); Wash Rev Code 26.20.035 ("[A]ny person who is *able* to provide support . . . and who . . . [w]illfully omits to provide necessary food, clothing, shelter, or medical attendance to a child dependent upon him or her . . . is guilty of the crime of family nonsupport."); W Va Code 61-5-29(1) ("A person who . . . [r]epeatedly and willfully fails to pay his or her court-ordered support which he or she *can reasonably provide* and which he or she knows he or she has a duty to provide to a minor . . . is guilty of a misdemeanor . . . ."); Wis Stat 948.22(6) ("[A]ffirmative defenses [to failure-to-support charges] include but are not limited to *inability* to provide child, grandchild or spousal support."); Wyo Stat Ann 20-3-101(c) ("It is an affirmative defense to a charge [of desertion] that the person was *unable* to provide adequate support but did provide such support as was within that person's *ability* and means."). (Each emphasis added.)

[53] Contrary to the majority's assertion, it is inconsequential at what stage of a criminal proceeding other states consider a defendant's inability to pay. Some states consider it as an affirmative defense, some as a traditional defense, and some require proof of ability to pay as an element of a nonsupport charge. The fact remains that it is a defendant's inability to pay that must be accounted for—not whether it is impossible to pay. No other

22

charges. The majority's decision risks being criticized as a chilling example of judicial activism.

## E. THE MAJORITY'S IMPOSSIBILITY-TO-PAY DEFENSE IS UNFAIR

My deep concern about the majority's holding stems not only from the fact that it adopts an unprecedented standard without support, but also from that standard's potential for deleterious effects. More pointedly, I fear a return to an era of debtors' prisons in which indigent individuals are imprisoned simply because they cannot meet their financial obligations.[54] The majority refuses to acknowledge that, unfortunate as it is, many people experience periods in their lives when they are insolvent. This fact does not automatically render them uncaring, deadbeat parents. And it should not necessarily render them criminals. Poverty is not a criminal offense, and our federal and state constitutions guarantee the impoverished the equal protection of the laws.[55] The majority's severe narrowing of the available defense to a nonsupport charge does not adequately safeguard these principles.

---

state recognizes impossibility to pay or impossibility as an affirmative or traditional defense to, or as an element of, a nonsupport charge.

[54] The United States Supreme Court has explicitly prohibited the practice of debtors' prisons. See, e.g., *Williams v Illinois*, 399 US 235, 241-242; 90 S Ct 2018; 26 L Ed 2d 586 (1970) ("[O]nce the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency."); *Tate v Short*, 401 US 395, 398; 91 S Ct 668; 28 L Ed 2d 130 (1971) ("[T]he Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.") (quotation marks and citation omitted).

[55] US Const, Am XIV; Const 1963, art 1, § 2.

23

In its effort to differentiate its impossibility-to-pay defense from an inability-to-pay defense, the majority paints a picture in which the only two options are at the extreme ends of the spectrum. On one end is the impossibility-to-pay defense, which is, as the majority admits, nearly impossible to meet. On the other is the inability-to-pay defense, which the majority mischaracterizes as cover for a simple refusal to pay. The majority mistakenly casts the inability-to-pay defense as one that gives carte blanche to cold-hearted parents who refuse to support their children, contrary to all moral decency. The reality is quite otherwise. As discussed earlier, in applying this defense, a court typically considers evidence of ability to pay and refusals to pay by those who could pay or could raise the money they owe.

The majority also identifies the most extreme example of a parent who would find it impossible to comply with a support obligation but is completely blameless. It posterizes this hypothetical person as the quintessential example of someone who would satisfy its new impossibility-to-pay defense. In doing so, the majority sends a clear signal to our lower courts: our impossibility-to-pay defense exists, but only the rarest of persons will qualify for it.[56] In essence, the majority has created a nearly-impossible-to-satisfy

---

[56] See *ante* at 31 ("[A] defendant must explore and eliminate all the reasonably possible, lawful avenues of obtaining the revenue required to comply with the support order."); *ante* at 31 ("Defendants must not only establish that they cannot pay, but that theirs are among the exceptional cases in which it was not reasonably possible to obtain the resources to pay.") (emphasis omitted); and *ante* at 32 n 75 (requiring "genuine" and "tru[e]" impossibility); see also *ante* at 49 (requiring "exceptional circumstances" to establish impossibility). The majority further injects confusion into its analysis by, at various points, labeling the requisite level of demonstrated impossibility "genuine" or "true."

24

defense.  The practical effect of this rule is to press a heavy thumb on the prosecutor's side of the delicate scales of justice.[57]

In an effort to provide comprehensive guidance, the majority creates an impossibility standard that offends traditional notions of fairness and common sense.  For example, it does not take into consideration that a defendant must have sufficient minimum resources to feed, clothe, and shelter himself or herself while satisfying a support obligation.  The penniless person should not be imprisoned for lacking the capacity to prioritize his or her finances or to arrange his or her financial affairs with future contingencies in mind.  Yet the majority's impossibility-to-pay defense would include that person.  That person would be imprisoned because, although he or she is unable to pay, it might not have been utterly impossible to pay had he or she known how to manage money better.[58]  That person would be imprisoned because, unable to pay, he

---

[57] See *People v Vaughn*, 491 Mich ___, ___; ___ NW2d ___ (2012), issued July 9, 2012 (Docket No. 142627) (CAVANAGH, J., concurring), slip op at 9.

[58] The majority's heavy reliance on public policy to support its impossibility-to-pay defense is surprising given the past reluctance of two members to rely on policy considerations when making precedent.  In *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492, 504; 638 NW2d 396 (2002), then Justice YOUNG and Justice MARKMAN stated that "[the Court's] function is not to . . . independently assess what would be most fair or just or best public policy."

Assuming that public policy is relevant, the majority's discussion raises unanswered questions.  For instance, does the majority consider the high cost borne by taxpayers for imprisoning felons?  Does it consider how those costs will increase to the extent we imprison a greater number of those who fail to make support payments?  A recent Pew Center report shows that Michigan already has one of the nation's highest incarceration rates and is one of only four states to spend more on prisons than higher education.  The Pew Center on the States, *Time served: The high cost, low return of longer prison terms*. June 2012.  Available at: <http://www.pewstates.org/uploadedFiles/ PCS_Assets/2012/Prison_Time_Served.pdf> (accessed July 3, 2012); see also State of

25

or she had failed to "seek timely modification of the family court order when it became evident that it could not be performed . . . ."[59] The majority offers no explanation why inability to pay, coupled with failure to seek modification of the order, should constitute grounds for imprisonment.

Furthermore, the majority seems not to consider the difficulty in producing sufficient evidence to mount a cognizable impossibility-to-pay defense. Proving an inability to pay, let alone satisfying the majority's impossibility-to-pay defense, is a complex and daunting legal matter. As one scholar has astutely observed:

> Proving inability to comply can be factually complex, implicating the economic circumstances of the obligor, his work history and potential, his available assets, and his own subsistence needs. To meet this burden, the alleged contemnor must at the very least present evidence of his or her employment (or lack thereof), wages, expenses, and assets.
>
> However, gauging the ability to pay may be much more complicated than this, involving issues of good faith responsibility for other obligations, voluntariness of the obligor's unemployment or underemployment, and the availability of borrowed funds or assets owned by others to satisfy the obligor's debt. There may be legal as well as factual components to these issues. The complexity of these issues puts them beyond the understanding of most indigents, who will rarely be able to effectively respond to the petitioner's case in these areas, much less present a case in chief of their own. Even the simplest "inability to pay" argument requires articulating

---

Michigan, *Executive Budget, Fiscal Years 2013 and 2014*, pp A-5, B-15. February 9, 2012. Available at: <http://www.michigan.gov/documents/budget/EB1_376247_7.pdf> (accessed July 3, 2012). Furthermore, it is estimated that Michigan will spend more than $37,000.00 per inmate per year housed in its prisons during 2013 and 2014. *Id.* at B-15. Does the majority weigh the opportunity cost to society when those imprisoned cannot earn wages and make *some* contribution toward a support obligation? Does it consider the dismantling of family bonds that results from imprisoning a delinquent parent who would otherwise still provide emotional support, love, or care to his or her family?

[59] *Ante* at 35.

the defense, gathering and presenting documentary and other evidence, and responding to legally significant questions from the bench—tasks which are probably awesome and perhaps insuperable undertakings to the uninitiated layperson. This is particularly true where the layperson is indigent and poorly educated.

Adding to the obligor's burden is the potential that the court will hold his or her testimony concerning inability to pay to be insufficient evidence or lacking in credibility in the absence of documentary corroboration. Retention of the necessary records among indigents is rare, particularly given the widespread instability in their employment, housing, and other aspects of their lives.[60]

Permitting only an impossibility-to-pay defense rather than an inability-to-pay defense heightens the level of evidence needed to refute a nonsupport charge. In a practical sense, it erects a barrier that will prove overwhelming to many who are not willful, recalcitrant, obdurate, or deceitful.

## F. THE MAJORITY'S IMPOSSIBILITY-TO-PAY DEFENSE IS UNCONSTITUTIONAL

Finally, the majority supports its impossibility-to-pay defense by suggesting that because family courts consider ability to pay when setting support obligations, by definition a support obligor is able to pay. There is much to criticize in this logic. It must be remembered that, because family court proceedings are civil in nature, they do not require the same high level of due process as criminal proceedings. They lack certain fundamental constitutional safeguards, including the right to trial by jury, the beyond-a-reasonable-doubt standard of proof, the right to counsel, and the right to effective

---

[60] Patterson, *Civil contempt and the indigent child support obligor: The silent return of debtor's prison.* 18 Cornell J L & Pub Pol 95, 120-121 (2008) (quotation marks and citations omitted).

assistance of counsel.[61] By allowing into evidence a family court's judgment regarding a defendant's ability to pay, the majority would allow evidence that has not been subjected to the constitutional rigors of a criminal trial. Doing so would threaten due process protections by undercutting the presumption of innocence and shifting onto defendants the burden of disproving the *actus reus* of the crime.[62]

In civil proceedings to set child support, trial courts employ a preponderance-of-the-evidence standard to make factual findings regarding a parent's ability to pay.[63] These ability-to-pay determinations include findings of imputed income based on an individual's potential earning capacity.[64] Ability-to-pay determinations are thus inherently linked to the *actus reus* of a subsequent criminal nonsupport charge.

---

[61] See, e.g., *United States v Mandycz*, 447 F3d 951, 962 (CA 6, 2006) ("Criminal cases offer many due process protections . . . that civil proceedings . . . do not."). The United States Supreme Court has also recognized "the fundamental proposition that criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings . . . ." *Hicks ex rel Feiock v Feiock*, 485 US 624, 632; 108 S Ct 1423; 99 L Ed 2d 721 (1988).

[62] It also creates enormous confusion to institute an impossibility-to-pay defense in a criminal proceeding, when, in the related civil action, the family court used an ability-to-pay standard. See, e.g., MCL 552.23(1).

[63] See, e.g., *Blue Cross Blue Shield of Mich v Governor*, 422 Mich 1, 89; 367 NW2d 1 (1985) ("It is generally well established that issues of fact in civil cases are to be determined in accordance with the preponderance of the evidence . . . .") (citations omitted).

[64] See 2008 MCSF 2.01(G).

But it is axiomatic that all elements of a criminal charge must be proved beyond a reasonable doubt.[65] The preponderance-of-the-evidence standard used in civil courts affords less protection than the constitutionally guaranteed beyond-a-reasonable-doubt standard of proof used in criminal courts.[66] By importing into a criminal proceeding a civil court's ability-to-pay determination and shifting the burden of proof to the defendant to show impossibility to pay, the majority endangers due process. Ability-to-pay determinations made in a civil court cannot constitutionally be used as the basis for establishing that a defendant was able to pay in a criminal case. Doing so diminishes the prosecution's burden of proof to a standard below the constitutional threshold.[67]

Furthermore, the majority injects principles of statutory interpretation as support for its impossibility-to-pay defense. It repeats throughout its opinion phrases such as

---

[65] *Sullivan v Louisiana*, 508 US 275, 277-278; 113 S Ct 2078; 124 L Ed 2d 182 (1993) ("The prosecution bears the burden of proving all elements of the offense charged and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements. This beyond-a-reasonable-doubt requirement . . . applies in state as well as federal proceedings.") (citations omitted); *In re Winship*, 397 US 358, 363-364; 90 S Ct 1068; 25 L Ed 2d 368 (1970) ("[A] society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt.").

[66] See *Waknin v Chamberlain*, 467 Mich 329, 335-336; 653 NW2d 176 (2002) ("[D]efendant was found guilty beyond a reasonable doubt—a standard of proof granting him protection greater than the preponderance of the evidence standard in the civil case . . . .").

[67] This analysis does not disturb the legitimacy of the civil court's underlying support order. That is, a defendant cannot relitigate in a criminal case the amount of a support order. He or she remains liable for that amount irrespective of the outcome of the criminal proceeding.

"[c]onsistent[] with the Legislature's expressed intent in the child support statutes"[68] and its unsupported claim that my analysis would "undermine Michigan's legislative system . . . ."[69] It similarly relies on its assertion that its interpretation is "consistent with the plain language of [the] statute . . . ."[70] Frequent repetition of these concepts does not turn the majority's assertions into facts. To be sure, an "interpretation" of a statute's plain language can nonetheless lead to an activist result.[71] As previously stated, there is *no* statutory language in MCL 750.165, express or implied, or in the child support statutes, that gives rise to an impossibility-to-pay defense.[72]

More importantly, the Legislature's intent with respect to the constitutionally mandated defense to a charge of felony nonsupport is extraneous. It is undisputed that some defense must be made available for MCL 750.165 to survive constitutional scrutiny. However, it is not the prerogative of the Legislature to set that constitutional floor. Rather, it is *this Court's* duty to determine what defense, at a minimum, must be made available in order for the statute to be constitutionally applied. By allowing the

---

[68] *Ante* at 2.

[69] *Ante* at 3.

[70] *Ante* at 3; see also *ante* at 50.

[71] *McCormick v Carrier*, 487 Mich 180, 209; 795 NW2d 517 (2010) ("[T]he . . . majority's 'interpretation' of the plain language of MCL 500.3135(7) was a chilling reminder that activism comes in all guises, including so-called textualism.") (citation and quotation marks omitted).

[72] The majority cannot rely on the child support statutes in support of its analysis. Those statutes govern civil proceedings in which the amount of a support award is set. They are irrelevant to criminal proceedings. MCL 750.165 is the only statute that concerns a criminal nonsupport charge.

purported legislative intent to dictate its outcome, the majority abdicates its duty as guardian of our citizens' constitutional protections.

## II. CONCLUSION

In sum, the majority's new impossibility-to-pay defense creates a nearly insurmountable barrier to successfully defending felony nonsupport charges. As Michigan has long recognized, it is only "the willful, the recalcitrant, the obdurate or deceitful" who are imprisoned for failing to meet their financial obligations.[73] In light of the majority's holding, we can now add to that list those who are unable to pay and cannot obtain the resources to pay. I believe that the majority's impossibility-to-pay defense will prove grossly unjust in its application and that it is fundamentally unconstitutional. Because a defendant's inability to pay is the proper defense to a felony nonsupport charge, I respectfully dissent.

                                         Marilyn Kelly
                                         Michael F. Cavanagh
                                         Diane M. Hathaway

---

[73] *Reed*, 53 Mich App at 627.